UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1622

AMINATA DIENG,

            Petitioner,

      v.

MICHAEL B. MUKASEY, United States Attorney General,

            Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 26, 2008                    Decided: July 7, 2008

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge, and David C. NORTON, Chief United States District Judge for the District of South Carolina, sitting by designation.

Petition denied by unpublished per curiam opinion.

**ARGUED:** Kell Enow, ENOW & PATCHA, Silver Spring, Maryland, for Petitioner. Andrew B. Insenga, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, Lindsay L. Chichester, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Aminata Dieng, a native and citizen of Senegal, petitions for review of a final order of the Board of Immigration Appeals ("BIA") affirming the immigration judge's ("IJ") denial of her applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), as well as the denial of her minor son's derivative claims. For the reasons set forth below, we deny the petition for review.

## I.

Dieng and her minor son are natives and citizens of Senegal. Dieng entered the United States on February 17, 2003, using a Senegalese passport belonging to another person and an American visa issued in someone else's name. Her son entered the United States shortly thereafter. The Immigration and Naturalization Service initiated removal proceedings against Dieng and her son on January 20, 2004, on grounds they had entered the United States without a valid visa or other entry document. Dieng concedes she and her son entered the United States without a valid visa or other entry document as alleged in the notices of removal. Removal proceedings were held before the IJ, who denied her applications. The BIA affirmed the IJ's decision by summary order.

As an initial matter, it is undisputed on appeal that Dieng was subjected to female genital mutilation ("FGM") in Senegal. At

2

the removal proceeding, Dieng testified that her parents ordered FGM to be performed on her when she was five years old. She also explained that FGM was and continues to be a common practice in Senegal, and that it is prevalent among members of the Toucouleur tribe, of which she is a member. The IJ, apparently crediting that testimony and other documentary evidence, found that Dieng suffered FGM as a child and therefore demonstrated past persecution. The government does not challenge that finding.

Dieng grounded her asylum claim on two separate arguments. First, Dieng asserted that she held a well-founded fear of future persecution because, if removed to Senegal, she would object to FGM being performed on her alleged daughter, who is still in Senegal. That objection, she argued, would result in physical abuse by her purported husband, who also still resides in Senegal. Second, Dieng claimed that she personally endured past persecution in the form of FGM, which automatically gives rise to a presumption that she holds a well-founded fear of future persecution. In requesting withholding of removal, Dieng claimed the severity of her past persecution (i.e., FGM and domestic abuse) warranted a discretionary grant of asylum. Finally, as to her application for protection under the CAT, Dieng apparently claimed that she would likely be "tortured" because her husband would abuse her and local police authorities would, based on their past unwillingness to intervene, acquiesce in that abuse.

3

A.

In her application and in testimony before the IJ, Dieng summarized her life in Senegal and the circumstances that brought her to the United States. She generally explained that women in her tribe were expected to be subordinate to the men and that all girls were circumcised at a young age. She recalled that her parents had FGM performed on her when she was five years old.

Dieng testified that, in 1995, her parents arranged for her to marry Malick Talla, who already had at least two other wives.[1] Dieng objected to the marriage, which resulted in her parents beating her severely. She eventually acquiesced to the marriage, and allegedly had two children with Talla—her son, who was born in 1997, and a daughter, who was born in 2000 and still lives in Senegal.[2] Dieng testified that Talla was physically abusive, beating her whenever she refused to have sexual intercourse with him.

---

[1]There are inconsistencies in the record as to the number of other wives Talla had. Dieng testified before the IJ that he had two other wives (making her the third wife). (J.A. 60, 78-79.) However, she earlier told the asylum officer that Talla already had three wives when she married him, thus making her the fourth wife. (S.J.A 19.)

[2]Petitioner's counsel raised at oral argument, apparently for the first time in the course of these proceedings, the prospect that Dieng has a second daughter, who was born in the United States in 2006. After oral argument, petitioner moved to supplement the record with the second daughter's Virginia-issued birth certificate. We denied the motion and, accordingly, do not rely on the existence (or non-existence) of a native-born daughter to reach our conclusions.

4

According to Dieng, Talla decided in May 2002 that FGM would be performed on her daughter. Talla beat Dieng with a whip or belt when she objected, and the physical abuse continued for as long as she continued to object to the procedure. Dieng testified that, although she sought assistance from local police on two occasions, they were unwilling to help. After several months, Dieng fled with her children to her friend Fama Sall's home, and then later to the home of Sall's father. Dieng left for the United States on February 17, 2003, leaving her two children with Sall's father in Senegal. Shortly thereafter, her son came to the United States. According to Dieng, Sall's father is still sheltering her daughter.

Among the various documents Dieng submitted with her application were a copy of her daughter's birth certificate that lists Malick Talla as the father and a copy of her son's birth certificate that lists "Le GrandBourre Louis" as the father. The inconsistency concerning the identity of Mouhamed's father would be an important part of the IJ's decision. Dieng also submitted the statements of a Toucouleur "Excision Specialist" and others who explained that all young Toucouleur girls undergo circumcision and are forced to marry at a young age regardless of whether they consent. A cousin and Sall provided statements corroborating the circumstances of Dieng's forced marriage to Talla.

During cross-examination before the IJ, Dieng explained how she entered the United States by using a Senegalese passport issued

to Sall Aibibatou Talla, one of her husband's other wives. Dieng testified that she obtained the passport from her husband's unlocked briefcase while looking for jewelry that Talla took from her. Dieng discarded the passport after her son arrived in the United States.

Counsel for the government questioned Dieng about the history of her visits to the United States. Dieng testified that she first visited the United States with her son in September 1999 but subsequently returned to Senegal. Dieng said she did not seek asylum at that time because she had no money and because her husband's cousin was monitoring her actions. Although Dieng testified that her son's only entries into the United States occurred in 1999 and in 2003, the government offered evidence that her son had entered the country on at least three other occasions. Dieng responded that her son may have traveled with her husband without her knowledge.

Other inconsistencies appeared in Dieng's testimony regarding her husband's name and identity. Despite Dieng's testimony that Talla was the father of both of her children, her son's birth certificate identified "Le Grandbourre Louis" as the father and listed her son's last name as "Rebeiz." When the government confronted Dieng with those inconsistencies, she testified that Talla was also called Le GrandBourre Louis Rebeiz and that she only neglected to mention that information earlier because she had not

been asked. She also testified that her son sometimes went by the name "Le GrandBourre Rebeiz." The government produced evidence in the form of an internet search that showed "Legrande Rebeiz" residing at Dieng's house in Virginia with the same phone number that Dieng put on her application for asylum.

The government sought further explanation of her daughter's current location and why Dieng left her in Senegal. Dieng explained that she could not bring her daughter to the United States because she lacked the required documentation to obtain a visa and that trying to obtain the necessary paperwork would generate "suspicions" in Senegal. Dieng provided a copy of her daughter's birth certificate, but the translation from French was incomplete and the document had been issued in November 2004—even though her daughter was supposedly born in 2000. When asked about these inconsistent dates, Dieng responded that she had received the copy from a friend in Senegal only a few months before; however, Dieng added that she had her daughter's original birth certificate with her in the United States—she just happened to leave it at home on the day of the hearing.

Dieng's cousin, Ibrahim Ndiaye, testified on her behalf at the removal proceeding. Ndiaye corroborated Dieng's statements that Talla abused her because of her opposition to subjecting her daughter to FGM. Further, Ndiaye testified that Dieng said she went to the police twice for help but that they refused to provide

7

assistance. However, on cross-examination, Ndiaye did not know that Dieng had two sisters, could not recall their names, and did not know the name of Dieng's mother. He also admitted that much of his knowledge of Dieng's circumstances was based solely on facts relayed to him by Dieng.

The IJ issued an oral order denying Dieng's application. The IJ concluded that FGM constitutes "persecution" under the applicable law and, as discussed above, found that Dieng suffered FGM as a child. The IJ apparently credited State Department reports, which Dieng offered into evidence, stating domestic violence is common in Senegal, that women in Senegal are often discriminated against, and-while FGM is not practiced by the largest tribe in Senegal—"FGM is performed on girls of most other ethnic groups." (J.A. 28-29.)

Other than Dieng's testimony that she suffered FGM, the IJ concluded the remainder of her testimony was not credible. He found that "there are simply too many problems with the respondent's testimony . . . to find her credible." (J.A. 30.) He specifically referred to the inconsistencies surrounding the number of other wives Talla had, her husband's name, the name of her son's father, the name by which she calls her son, and her son's multiple prior visits to the United States. He also referred to the government's evidence that a "Legrand Rebeiz" resides at Dieng's home in

8

Virginia. The IJ found all of her explanations refuting the discrepancies to be unconvincing, illogical, and unsupported by corroborating evidence.

The IJ also questioned the credibility of Dieng's testimony concerning Talla's abusive and controlling nature. In particular, he doubted Dieng's testimony about her husband's abuse and controlling nature because, as the IJ stated, it did "not seem logical" that he would allow her and their son to visit the United States unaccompanied. (J.A. 31.) The IJ further questioned why Dieng returned to Talla in Senegal after her 1999 trip to the United States if he inflicted such severe abuse. Finally, he noted that it did not seem plausible, given Dieng's testimony that Talla was so controlling and untrusting, that Talla would leave someone else's passport, their son's passport, and their son's birth certificate where she could find them.

The IJ noted at least three problems concerning Dieng's testimony as to her daughter. First, the IJ found that it was "unusual" that Dieng would come to the United States with her son and while she was pregnant with her daughter, but then return to her "abusive, controlling husband in Senegal." (J.A. 32.) Next, if Dieng actually feared her daughter would subjected to FGM, the IJ found it "unusual" for her to leave her daughter in Senegal where Talla could find her. Id. Those statements indicate the IJ

9

discredited even the portions of Dieng's testimony concerning her purported daughter.

Having discredited the bulk of Dieng's testimony, the IJ examined whether the evidence she submitted rehabilitated her claims. First, he discounted her cousin's testimony because he had little personal knowledge of the events, receiving most of the information second-hand from others. Second, the IJ found the birth certificates were "suspect" because her daughter's was issued in 2004 and was only partially translated, and her son's contained an unusual name for the father. The IJ concluded that the other documentary evidence, specifically the statements of persons in Senegal, were unreliable because those individuals were unavailable for cross-examination. "Even taken cumulatively, they are insufficient to overcome the difficulties in the respondent's testimony." (J.A. 33.) Finally, the IJ "agree[d] with DHS counsel that there is little reliable evidence of the existence of the respondent's daughter other than a copy of a birth certificate with an incomplete translation from French." (J.A. 32.)

Because the IJ found that Dieng has been subjected to FGM, he concluded that she had established past persecution. However, he determined the government rebutted the presumption of a well-founded fear of future persecution by demonstrating "fundamentally changed personal circumstances." (J.A. 33.) The IJ explained the basis for that decision:

10

> I find that the respondent's decision to re-avail herself of the protection of Senegal and return to her husband in 1999 when she was approximately 27 years old after she had allegedly been abused, and when she had her son with her and was pregnant with her daughter, constitutes a fundamental change in personal circumstances that eliminates the future fear of persecution on the basis of FGM.

(J.A. 33-34.) The IJ also refused to issue a discretionary grant of asylum, concluding: (1) that the long period of time since she underwent FGM and her return to Senegal in 1999 indicated that asylum based on severity of past harm was not warranted; and (2) that there was no credible evidence supporting a grant of asylum based on serious harm if she returned to Senegal.

The IJ went on to consider Dieng's application for withholding of removal and for protection under the CAT. He denied the applications for withholding of removal because she failed to meet the lower burden of proof required for asylum. As to the CAT, he concluded that, even if the domestic violence women experience in Senegal qualified as "torture," Dieng failed to show a probability that she would be subjected to such treatment by the Senegalese government or with that government's acquiescence. Accordingly, he denied the application and ordered Dieng and her son's removal to Senegal.

Dieng appealed to the BIA, which affirmed the IJ's decision by summary order on May 2, 2006. Dieng timely filed the instant petition for review of the BIA's order.

11

This Court has jurisdiction to review the BIA's order pursuant to 8 U.S.C. § 1252(a). When the BIA issues a summary opinion, the IJ's order becomes the sole basis for review. See Kattak v. Ashcroft, 332 F.3d 250, 253 (4th Cir. 2003). We will uphold the agency's legal conclusions "unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). The agency's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude the contrary." Id. § 1252(b)(4)(B).

III.

Dieng first argues the IJ predicated his decision on an erroneous adverse credibility determination. Because of that determination, the IJ chose not to consider the bulk of Dieng's testimony and denied her asylum application insofar as she claimed a well-founded fear of future persecution unconnected to any past persecution. As to her asylum claim based on past persecution, Dieng argues the IJ erred in concluding that the government rebutted the presumption of a well-founded fear of persecution that arose from her past subjection to FGM.

Alternatively, Dieng contends that even if the government did overcome the presumption, the IJ should have granted asylum for two reasons. First, Dieng established a well-founded fear of future persecution in that she would be physically abused because of her

objection to her daughter's threatened FGM procedure. Second, she is entitled to a discretionary grant of asylum given the severity of her past persecution. Finally, Dieng challenges the IJ's decision denying her applications for withholding of removal and for protection under the CAT.

A.

The applicant generally bears the burden of proving eligibility for asylum. 8 C.F.R. § 1208.13(a); Naizgi v. Gonzales, 455 F.3d 484, 486 (4th Cir. 2006); Gandziami-Mickhou v. Gonzales, 445 F.3d 351, 353 (4th Cir. 2006). Under the Immigration and Naturalization Act, an alien who qualifies as a "refugee" is eligible for asylum. See 8 U.S.C. § 1158(b)(1)(A). The definition of a "refugee" includes an alien who is unable or unwilling to return to their country of citizenship "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). "Persecution involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds." Li v. Gonzales, 405 F.3d 171, 177 (4th Cir. 2005) (internal quotations omitted) (quoting Kondakova v. Ashcroft, 383 F.3d 792, 797 (8th Cir. 2004)).

Dieng sought asylum claiming that she had a well-founded fear of future persecution. An applicant who seeks asylum based on a

13

well-founded fear of future persecution "must show (1) that a reasonable person in the circumstances would fear persecution; and (2) that the fear has 'some basis in the reality of the circumstances' and is validated with 'specific, concrete facts.'" Huaman-Cornelio v. BIA, 979 F.2d 995, 999 (4th Cir. 1992) (quoting M.A. v. INS, 899 F.2d 304, 311 (4th Cir. 1990) (en banc)). That test has both a subjective and objective element: "a subjective inquiry into what the applicant for asylum fears and an objective finding of facts on which to base that fear." Id. The subjective element requires the applicant to demonstrate a "genuine fear of persecution." Chen v. United States INS, 195 F.3d 198, 201 (4th Cir. 1999).

The IJ's decision on Dieng's application for asylum, as well as his resolution of the other issues in this case, is tied to the adverse credibility determination with respect to Dieng's testimony. We defer to the agency's credibility determinations if supported by substantial evidence. Camara v. Aschroft, 378 F.3d 361, 367 (4th Cir. 2004). That is, the determinations must be supported by "evidence that is 'reasonable, substantial, and probative . . . on the record considered as a whole.'" Dankam v. Gonzales, 495 F.3d 113, 120 (4th Cir. 2007) (alterations in original) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). The deference afforded to the agency's credibility determinations "is not absolute," meaning that, in addition to

14

being supported by substantial evidence, the trier of fact must offer "'a specific, cogent reason'" for rejecting the witness's testimony. See id. at 120-21 (citing Camara, 378 F.3d at 367; Figeroa v. INS, 886 F.2d 76, 78 (4th Cir. 1989)). An applicant's inconsistent statements or the presence of contradictory evidence "qualify as cogent reasons that could support an adverse credibility finding." Id. at 121. We will not defer, however, to an adverse credibility finding that is grounded on the IJ's speculation, conjecture, or unsupported personal opinion. Id.

The IJ based his adverse credibility finding on inconsistencies in Dieng's statements and unexplained discrepancies between her statements and the documentary evidence, including: (1) the number of wives Talla, her purported husband, had; (2) the number of times her son had traveled to the United States without her knowledge; (3) Talla allowing her to travel to the United States with her son despite his alleged controlling and abusive nature; (4) her husband's name and the name of her son's father, who was identified as "Le GrandBourre Louis" on the birth certificate; (5) evidence that a person named "Legrand Rebeiz" lived at her home in Virginia; and (6) the easy availability of her son's passport and birth certificate and a passport she could use compared with the lack of access to similar information for her alleged daughter.

We conclude the IJ's adverse credibility determination was based on substantial evidence and that the IJ offered "specific, cogent reasons" for that finding. Dieng never explained why she told the asylum officer that she was Talla's fourth wife, but testified at the removal proceedings that she was his third wife. Dieng's testimony that her husband allowed her and her son to travel to the United States in 1999 was inconsistent with the general picture she painted of him. Indeed, Dieng testified that, before coming to the United States in 2003, she had to wait until her husband went to mosque before fleeing and that her husband was "very angry" and "looking for [her]." (J.A. 70.) Dieng's apparent easy access to her son's important documentation and a passport she could use also stand in sharp contrast to her general description of Talla's controlling nature.

Dieng gave repeated statements in her written applications and testimony that Malick Talla was the father of her two children. However, her son's birth certificate lists "Le GrandBourre Louis" as the father and as Dieng's husband. (J.A. 231.) She first attempted to explain that the discrepancy as the result of a custom whereby the name of the child's grandfather is placed on the birth certificate. (J.A. 90.) When further pressed by government's counsel and the IJ on the fact that the birth certificate expressly refers to Le GrandBourre Louis as the "father," she then explained–apparently for the first time–that Talla is also known as

16

Le GrandBourre Louis. (J.A. 90-92.) Government counsel also questioned Dieng about an internet directory search that showed a person by the name of Legrand Rebeiz lived at her address in Virginia Beach, Virginia. Dieng stated that she had "no idea" why such a name would be revealed on an internet directory search, but Dieng's counsel offered–without providing any basis for his statement–that her son also goes by the name of Legrand Rebeiz. (J.A. 92-93.) The IJ found it highly unlikely that Dieng's seven-year-old son would be included in the search. Such a conclusion was supported by substantial evidence given that Dieng herself testified that she had "no idea" why the search would reveal that name–a statement that directly contradicts counsel's contention that it was her son's alias. Dieng would presumably be more familiar with her son's names, nicknames, and aliases than her counsel.

These inconsistencies went to the core of Dieng's asylum claim. Dieng claimed a well-founded fear of future persecution on grounds that she, if returned to Senegal, would object to FGM being performed on her daughter. That objection would draw physical retribution by her purported husband. Thus, her husband's identity, his history of abusing her, and his controlling nature lie at the heart of her claim–making them more than just minor details.

We have explained the effect of an adverse credibility determination in asylum cases:

17

> It is true that an unfavorable credibility determination
> is likely to be fatal to an asylum claim because often
> the applicant must establish a well-founded fear of
> persecution, which contains both subjective and objective
> components, and the subjective element cannot generally
> be proved other than through the applicant's testimony.
> Thus, a determination that the applicant's testimony is
> not credible will generally defeat the claim.

Camara, 378 F.3d at 369 (internal quotations and citations omitted). The IJ's adverse credibility determination made it substantially more difficult for Dieng to show a subjective fear of persecution. There was no other evidence in the record demonstrating that Dieng held such a subjective fear of future persecution. Thus, the IJ did not err in denying Dieng's asylum claim to the extent it was grounded on a well-founded fear of future persecution resulting from objections to her daughter's threatened circumcision.

B.

Although the IJ discredited nearly all of Dieng's testimony, he credited her testimony and supporting evidence showing that she had undergone FGM as a child. As a result, the IJ concluded that Dieng demonstrated that she had suffered from past persecution, a conclusion the government does not dispute.[3] Upon showing past

---

[3]It is well-established in this circuit and other circuits that FGM generally qualifies as "persecution" under the Immigration and Naturalization Act. See Barry v. Gonzales, 445 F.3d 741, 745 (4th Cir. 2006); Mohammed v. Gonzales, 400 F.3d 785, 796, 797 n.16 (9th Cir. 2005); Niang v. Gonzales, 422 F.3d 1187, 1197, 1199-1200 (10th Cir. 2005); Abay v. Ashcroft, 368 F.3d 634, 638 (6th Cir. 2004); Abankway v. INS, 185 F.3d 18, 23-24 (2d Cir. 1999).

18

persecution, the alien is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1); Li, 405 F.3d at 176. The government "may rebut this presumption by demonstrating by a preponderance of the evidence . . . 'a fundamental change in circumstances such that the applicant  no longer has a well-founded fear of persecution.'" Essohou v. Gonzales, 471 F.3d 518, 520 (4th Cir. 2006) (quoting 8 C.F.R. § 1203.13(b)(1)(i)(A)). Alternatively, the government may rebut the presumption by showing "that the applicant could avoid future persecution by internally relocating to another part of the country and it would be reasonably possible to do so." Id. (citing 8 C.F.R. 1208.13(b)(1)(i)(B)).[4]

The IJ concluded that Dieng's return to Senegal in 1999 with her son following her first visit to the United States "constitutes a fundamental change in personal circumstances that eliminates the future fear of persecution on the basis of FGM." (J.A. 34.) The evidence does not compel a contrary conclusion. The evidence was

---

[4]The Ninth Circuit has applied a "continuing harm theory" in asylum cases involving FGM. See Mohammed v. Gonzales, 400 F.3d 785, 796, 801 (9th Cir. 2005). The Ninth Circuit reasoned in Mohammed that victims of FGM suffer from permanent, lasting effects that "render[] a petitioner eligible for asylum, without more." Id. at 799. Thus, under Mohammed, it would be impossible for the government to rebut the presumption that arises because of past persecution. See id. at 801. However, the ongoing harm theory has no application in this case for two reasons. First, petitioner did not rely on the theory to support her asylum claim in proceedings before the agency nor does she rely on the theory in support of her petition for review. Second, any application of the theory here would likely be foreclosed by the BIA's decision in In re A-T, 24 I & N Dec. 296, 299-301 (BIA 2007), which declined to adopt the Ninth Circuit's analysis in FGM cases.

uncontroverted (and Dieng herself testified) that she and her son entered the United States in 1999 and then returned to Senegal approximately one month later. An alien's interim return to her country of citizenship can be evidence she does not hold a well-founded fear of future persecution. See Karouni v. Gonzales, 399 F.3d 1163, 1175-76 (9th Cir. 2005); Ngarurih v. Ashcroft, 371 F.3d 182, 189-90 (4th Cir. 2004); Bereza v. INS, 115 F.3d 468, 474 (7th Cir. 1997). In this case, Dieng lived in Senegal for many years after enduring FGM and before coming to the United States in 1999. She then returned to Senegal, where she lived for more than three additional years. There is no evidence, aside from Dieng's discredited statements and the undisputed fact that she suffered FGM decades ago, that she was persecuted during those long periods when she resided in Senegal, both before and after coming to the United States in 1999. Thus, the IJ could reasonably conclude that Dieng lacked a well-founded fear of future persecution. See Ngarurih, 371 F.3d at 184 (upholding IJ's denial of asylum where there was no evidence of persecution during alien's two-month interim return to native country); Bereza, 115 F.3d at 474 (stating that an alien's six-to-seven-month interim return without incident supports the conclusion that his "fear of persecution is not well-founded").

There was certainly evidence in the record apart from Dieng's discredited testimony, particularly her cousin's testimony and her

friend Sall's statement, showing that she had been physically abused by her purported husband. Although the IJ discredited that evidence as lacking a basis in personal knowledge or as unreliable, that evidence–even if credited–did not show that the abuse was "persecution" under the Act, particularly that it was committed on account of an enumerated ground. See 8 U.S.C. § 1101(a)(42)(A) (providing that an alien is eligible for asylum when she holds a "well-founded fear of future persecution on account of race, religion, nationality, membership in particular social group, or political opinion.")

Accordingly, we conclude that the evidence does not compel a conclusion contrary to that reached by the IJ and that his decision is supported by substantial evidence.

C.

Dieng next challenges the IJ's decision not to issue a discretionary grant of asylum on humanitarian grounds. "Even if the [agency] meets its burden to establish that a victim of past persecution does not have a well-founded fear of future persecution, the applicant may still be eligible for asylum on 'humanitarian' grounds." Naizgi, 455 F.3d at 486 (citing 8 C.F.R. § 1208.13(b)(1)(iii)). The IJ has discretion to grant asylum to a refugee in those circumstances if: (1) "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past

21

persecution;" or (2) "[t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii).

We have held that a discretionary grant of asylum based on the severity of the past persecution is "reserved for the most atrocious abuse," meaning that the past persecution was so severe as to make it "inhumane to return the alien even in the absence of any risk of future persecution." Gonahasa v. INS, 181 F.3d 538, 544 (4th Cir. 1999). Following that narrow construction, we have declined to find abuse of discretion in cases involving an entire family's forced expatriation from their native country, see Naizgi, 455 F.3d at 488, political interrogation under threat of execution accompanied by months of solitary confinement, see Ngarurih, 371 F.3d at 185, and torture that included the removal of the petitioner's teeth with pliers and a screwdriver, see Rusu v. United States, 296 F.3d 316, 325 (4th Cir. 2002). In light of our decisions involving past persecution, the IJ's decision not to issue a discretionary grant of asylum based on Dieng's subjection to FGM—which occurred approximately thirty years ago—was not manifestly contrary to law or an abuse of discretion.

Nor can we conclude that the IJ abused his discretion by denying asylum on grounds that Dieng "may suffer other serious harm upon" her return to Senegal. Dieng's discredited testimony was the only evidence supporting her argument that she would suffer harm

22

upon returning to Senegal. We have indicated that some circumstances involving a mother who had been subjected to FGM and a daughter who will be subjected to FGM may warrant a grant of discretionary asylum. See Niang v. Gonzales, 492 F.3d 505, 509 n.4 (4th Cir. 2007) ("[A] humanitarian grant of asylum may be warranted in circumstances where a mother, who has been subjected to FGM, fears her daughter will be subjected to FGM if she accompanies her mother to the country of removal.") In this case, however, there was no credible evidence to indicate that Dieng even has a daughter in Senegal.[5] Accordingly, the IJ did not abuse his discretion in denying Dieng's application for asylum to the extent it was based on a claim that she would suffer "other serious harm" if returned to Senegal.

D.

To qualify for withholding of removal, the petitioner must demonstrate that upon return her "life or freedom would be threatened . . . because of his race, religion, nationality, membership in a particular social group, or political opinion. 8

---

[5]Additionally, whatever psychological harm Dieng would suffer from the fact that her purported daughter may undergo FGM does not rise to the level of persecution, and thus would not rise to the level of severity requiring a grant of discretionary asylum. See Niang, 492 F.3d at 512 (holding that "'persecution' cannot be based on a fear of psychological harm alone"); 65 Fed. Reg. 76121, 76127 (Dec. 6., 2000) (explaining that "other serious harm" is "harm that is not inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but is so serious that it equals the severity of persecution.")

23

U.S.C. § 1231(b)(3). While closely related to an application for asylum, withholding of removal requires satisfaction of a higher burden of proof. Camara, 378 F.3d at 367. "Because the burden of proof for withholding of removal is higher than for asylum-even though the facts that must be proved are the same-an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal under § 1231(b)(3)." Id. Given Dieng's failure to demonstrate eligibility for asylum, the IJ did not err in denying her application for withholding of removal.

E.

Under the CAT, Dieng qualifies for protection if she shows that "it is more likely than not that . . . she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that the torture would be "inflicted by or at the instigation or acquiescence of a public official or other person acting in an official capacity," id. § 1208.18(a)(1). Dieng apparently claims that Talla's purported abuse is "torture" under the CAT because law enforcement officers failed to intervene when asked, thereby acquiescing in her husband's abusive conduct. However, the IJ did not err in denying Dieng's application for protection under the CAT because there was no credible evidence to support her claim. The IJ's adverse credibility determination as to Dieng's testimony eliminated the best evidence before the agency that supported her claim for protection under the CAT, and the

24

remainder of the evidence in the record either failed to support her claim or was otherwise not credible.[6] Thus, as with Dieng's application for asylum and withholding of removal, the adverse credibility determination as to her testimony proved fatal to her claim for protection under the CAT.

IV.

For the foregoing reasons, we deny the petition for review.

PETITION DENIED

---

[6]Ibrahim Ndiaye testified at the removal proceedings that Dieng went to the authorities regarding her husband's abuse, but that they did not "do anything" about it. (J.A. 122.) While that testimony could provide some support for Dieng's claim under the CAT, Ndiaye also noted he had no personal knowledge of Dieng's interactions with the police. Rather, his knowledge came from what Dieng told him. Id. Given Ndiaye's lack of personal knowledge and his own credibility problems, and the fact that what knowledge he had came from Dieng (whose own testimony was deemed not credible), the IJ was entitled to disregard Ndiaye's testimony.

25