**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1886**

NGAWUNG ATEMNKENG,

        Petitioner,

    v.

WILLIAM P. BARR, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  October 29, 2019                Decided:  January 24, 2020

Before GREGORY, Chief Judge, WYNN, and THACKER, Circuit Judges.

Petition for review granted; vacated, and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Thacker joined.

**ARGUED:** Ronald Darwin Richey, LAW OFFICE OF RONALD D. RICHEY, Rockville, Maryland, for Petitioner.  Robert Dale Tennyson, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Joseph H. Hunt, Assistant Attorney General, Carl McIntyre, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GREGORY, Chief Judge:

Ngawung Atemnkeng, a citizen of Cameroon, fled her country after participating in anti-government meetings and protests, getting arrested and was detained without trial several times, being tortured and beaten by government officers, and receiving numerous death threats. An immigration judge ("IJ") initially noted some inconsistencies in Atemnkeng's application, but nevertheless found her credible and her explanations plausible, and granted her asylum application. On appeal, the Board of Immigration Appeals ("BIA") reversed the IJ's determination and instructed the IJ, in reviewing the asylum application a second time, to afford Atemnkeng an opportunity to explain any inconsistencies.

On remand, Atemnkeng has now relocated to Baltimore and the new IJ ("Baltimore IJ") permitted her to submit additional documents in support of her asylum application and scheduled a master calendar hearing. Approximately one month prior to the hearing, however, the Baltimore IJ issued a written ruling denying Atemnkeng's applications for asylum and other reliefs. The Baltimore IJ concluded, without Atemnkeng's new testimony, that she was not credible in light of inconsistencies in her story. On a second appeal to the BIA, the Baltimore IJ's ruling was affirmed without an opinion. Atemnkeng now petitions for review of the BIA's summary affirmance of the Baltimore IJ's rulings.

In her petition for review, she raises several claims, most notably, that her due process rights were violated when the Baltimore IJ deprived her of an opportunity to testify on remand. Concluding that Atemnkeng's claim related to her ability to testify is meritorious, we grant the petition for review, vacate the BIA's affirmance, and remand for

2

further proceedings.  In light of our conclusion that the Baltimore IJ failed to give Atemnkeng an opportunity to testify and weigh the relevance of that testimony in conjunction with the entire record, we decline to address whether the adverse credibility determination and denials of Atemnkeng's applications for withholding of removal and relief under the Convention Against Torture ("CAT") were erroneous.

I.

Atemnkeng is a national and citizen of Cameroon.  She and her family lived in the southwestern area of the country called the British Southern Cameroon Region (the "Region").  In the Region, most Cameroonians speak English—even though the majority in the rest of the country speak French—and support independence and secession from the Cameroonian government.  The Southern Cameroon National Council ("SCNC") is a political organization founded in 1972 that advocates for the secession of the Region.  Atemnkeng was an SCNC member before her departure from Cameroon.  Prior to discussing Atemnkeng's historical persecution, departure, and asylum claim, we will briefly address the country conditions in Cameroon and the SCNC's status in the country.

A.

Cameroon, whose population was approximately 19 million in 2009, has been dominated by a "strong" presidency controlled by one party, the Cameroon People's Democratic Movement ("CPDM").  Though Cameroon has a multiparty system of government, CPDM has remained in power since it was created in 1985.  Its leader, Paul Biya, has also remained in office since that time, and has retained power to control

3

legislation and ruled by decree. Biya's 2004 presidential reelection—the reelection year relevant to Atemnkeng's asylum claim—was marked by irregularities, particularly in the voter registration process. (Observers, however, noted that the irregularities did not affect the 2004 presidential election results.) Similarly, the legislative and municipal elections in 2007—again, the year relevant to Atemnkeng's asylum claim—were marked by various deficiencies, including numerous barriers to voter registration, inadequate safeguards against fraudulent voting, and instances in which security forces acted independently of civilian control over voting and polls.

Non-government entities and legal observers also noted that police officers occasionally had made "Friday arrests," or massive arrests of civilians based on "spurious charges." While detainees may seek judicial review of an arrest, courts did not convene on weekends, so detainees often remained in detention until the following Monday. Police officers likewise conducted random neighborhood sweeps, sealing off an entire neighborhood, allegedly seeking criminals and stolen goods, and often arbitrarily arresting persons based on suspicious activities. Cameroonian law theoretically provides for individuals' freedom (*e.g.*, requiring officers to obtain a warrant prior to an arrest, obtaining legal counsel, and receiving bail), but these rights have seldom been respected by officers and exercised by detainees. Cameroonian law similarly theoretically provides for freedoms of assembly, speech, and the press, but these rights have been severely restricted. For instance, the government enforced media regulations irregularly, often implementing arduous requirements selectively for regime critics and using expansive libel laws to arraign journalists critical of governmental conduct.

4

As noted above, SCNC advocates for the secession of the English-speaking Region from Cameroon due to suppression of human rights and an authoritarian regime under Biya. SCNC, however, did not have legal status as it had never filed an application to become either a political party or a legally recognized organization. Moreover, the Cameroonian government, under Biya's rule, considers SCNC to be an "illegal" group because it advocates for secession of the Region. In many years, there were reports that the government put the houses of SCNC officials and activists under surveillance, searched the houses of SCNC leaders, and disrupted SCNC meetings in private residences. Authorities also routinely refused to grant SCNC permission to hold rallies and meetings, and security forces routinely arrested and detained SCNC activists.[1]

## B.

Atemnkeng was born in 1986 and belonged to the Bangaw Tribe.[2] As noted above, her family lived in the predominantly English-speaking Region. While still in Cameroon, she lived with her mother and helped her mother's business in the market as a saleslady.

---

[1] As one example, on February 23, 2009, security forces in Mutenguene, South West Region, arrested 25 SCNC activists gathered in the residence of one of their national leaders. As another example, approximately one month later, on March 21, 2009, security forces in Bamenda, North West Region, arrested approximately 70 SCNC activists who were meeting to discuss the United Nation's demarcation of the border between Cameroon and Nigeria. Similar incidences also occurred in 2010. For instance, on September 29, 2010, security forces in Kumbo, North West Region, arrested and briefly detained five SCNC activists who were gathering material to commemorate the 49th anniversary of the independence of the West Region, an anniversary not recognized by the government.

[2] We note that the administrative record refers to Atemnkeng's tribe both as "Bangaw" and "Bangwa." *Compare* A.R. 265 *with id.* 702.

5

In May 2010, Atemnkeng married her husband, but continued living with her mother since her husband was attending college far away from home.

In 2007, while still in high school, Atemnkeng joined SCNC where she frequently participated in meetings, disseminated flyers, joined protests, and supported other SCNC activities. She continued her activities with SCNC after high school and into 2010 prior to her departure from the country that year. She did not, however, hold a leadership position within SCNC. Between 2007 and 2010, Atemnkeng attended about ten SCNC meetings, each lasting two to three hours. These meetings took place at different locations. Each time a meeting occurred, members feared disruption or violence from the French-speaking government, police, or people against secession.

In September 2010, Atemnkeng attended an SCNC meeting at an unnamed member's house. There were approximately 50–60 members in attendance. The meeting started with its normal procedures—prayers and reading of the previous meeting minutes— for about 30 minutes. At this point, while the president of SCNC was speaking, a group of approximately 60 French-speaking people stormed into the meeting with guns, machetes, and sticks. Some members in attendance were severely beaten, others were critically injured that required hospitalization, and some even died.

Atemnkeng herself was beaten all over her body and, in the process of running away, dislocated her ankle. She hopped on a motorcycle and rode to a friend's house to hide. Her injuries needed treatment for about one week and it took two more weeks for her to fully recover. After this incident, she received numerous phone calls and text messages threatening to kill her if she did not stop participating in SCNC activities and leave the

6

group. (Atemnkeng later indicated that she had previously received similar death threats prior to this incident.) Because she had lost her phone prior to departing Cameroon, she did not have proof of the phone calls or text messages. Unwilling to give up her support of SCNC, but fearing for her life and freedom, she left Cameroon in early October 2010, approximately three weeks after the incident when she fully recovered from her injuries. Had she stayed in Cameroon, she would be a "dead person by now." A.R. 138.

Atemnkeng left Cameroon by boat with about 15 other passengers, traveling for three hours until she arrived in Nigeria. It is unclear for how long she stayed in Nigeria, but she then traveled—again by boat—to an unknown port city in Mexico. Once in Mexico, she then traveled by bus for several days to the United States border at Nogales, Arizona, and immediately requested asylum upon arrival.[3] This was on December 12, 2010, approximately two months after her departure from Cameroon. Atemnkeng was then detained at the Department of Homeland Security's ("DHS") Eloy Processing Center and appears to have remained in detention during the pendency of her asylum application.

On January 11, 2011, Atemnkeng provided a sworn statement in support of her asylum application and attended a credible fear interview, during which an asylum officer asked Atemnkeng about her political activities in Cameroon, persecution, departure, and fear of returning to the country. After the interview, the asylum officer made a preliminary determination that Atemnkeng had established a credible fear of persecution. On June 27, 2011, Atemnkeng then attended a merit hearing in support of her asylum application. The

---

[3] She stated that she was "transiting only" through Mexico and did not ask for or receive legal status in the country.

IJ reviewed Atemnkeng's application, including the asylum officer's initial credible fear determination, and asked her questions about her asylum claim for several hours. At the conclusion of the merit hearing, the IJ deferred on a ruling.

On July 14, 2011, the IJ issued an oral decision granting Atemnkeng's asylum application. The IJ first noted that he "has observed the demeanor, candor, and responsiveness of [Atemnkeng], the inherent plausibility of her account, and the consistency between her account and the record of proceedings as a whole." A.R. 509. He also noted certain inconsistencies in the record. As one example, Atemnkeng listed the political party she belonged to as both the SCNC and the National Council of Nigeria and Cameroon ("NCNC") in her asylum application and referred exclusively to NCNC at her credible fear interview. She later explained that the inconsistency was to disguise SCNC meetings as activities of the NCNC—a group that had been defunct for over 30 years. Despite the inconsistencies,[4] however, the IJ found Atemnkeng credible and the explanations for the inconsistencies plausible, and granted her asylum application. The IJ deemed her applications for withholding of removal and relief under the CAT moot.

The Government appealed the IJ's grant of asylum. On January 12, 2012, the BIA reversed in part, vacated in part, and remanded the action to the IJ, finding that there were

---

[4] There were several other examples of inconsistencies in Atemnkeng's story that were not identified by the IJ. She initially stated that she had ran to her friend's house after the ambush at the SCNC meeting, only later to correct herself that she had hopped on a motorcycle for a ride. She also initially stated that the threatening calls had ended when she lost her phone, only later to correct herself that she had swapped the SIM card from her phone with a friend's phone. She further initially stated that she had not earned income in Cameroon but somehow paid for the cost of the trip to Mexico herself, only later to correct herself that she had saved money by selling snails at the market since 2007.

8

significant discrepancies in Atemnkeng's account that were inadequately explained. Without expressing any opinion as to whether Atemnkeng was credible, the BIA instructed the IJ to address all inconsistencies and afford Atemnkeng a "further opportunity" to explain them on remand. A.R. 388. The BIA also instructed the IJ to make "clear and concise" findings of fact and conclusions of law regarding credibility. *Id.*

In March 2017, the Baltimore IJ[5] held a hearing with the parties' counsel to discuss Atemnkeng's case. The Baltimore IJ asked Atemnkeng's counsel if he wanted to "submit [the case] on the record" or to "try it all over again . . . and [the judge would] give it to lower courts . . . [to] figure out [what] to do with it." A.R. 257. Atemnkeng's counsel responded that he "could submit [] an affidavit from [Atemnkeng] explaining any concerns that [the BIA] had." *Id.* The Baltimore IJ then scheduled a master calendar hearing on Atemnkeng's application for August 1, 2017.

On June 6, 2017, Atemnkeng submitted an affidavit and supplemental documents in support of her application, attempting to explain any perceived inconsistencies. For instance, she indicated that she speaks English with a very heavy accent, so some people might think that she said NCNC when she in fact only said SCNC. In addition, she clarified that she initially disabled her phone and used a friend's phone for about a month. Notably, however, she indicated that the attack at the SCNC meeting occurred in October 2007 instead of the originally stated date of September 2010.

---

[5] In between the initial grant of asylum and this hearing, Atemnkeng was released from detention and relocated to Baltimore.

Atemnkeng also provided new facts and documents. She was arrested and detained without trial four to five times while in Cameroon. She was also tortured, including beatings with police officers' belts and clubs. Her father was active in opposition politics and arrested numerous times. Her brother disappeared in February 2017. She nevertheless continued to be an active member of the SCNC and pro-democracy movement in the United States. She finally submitted affidavits from a human rights lawyer, her spouse, her cousin, her pastor, and the National Chairman of SCNC in Cameroon, collectively explaining the political opposition to SCNC in Cameroon and her persecution.

On July 12, 2017, prior to the scheduled hearing, the Baltimore IJ issued a written decision denying Atemnkeng's applications for asylum, withholding of removal, and relief under the CAT. The Baltimore IJ concluded Atemnkeng was not credible and she did not present sufficient independent evidence to overcome this adverse credibility finding because there were various material inconsistencies and omissions between her oral testimony from the first merit hearing and documentary evidence. The Baltimore IJ also explained parts of Atemnkeng's testimony were not plausible, such as the incorrect date of the SCNC meeting (*i.e.*, October 2007 versus September 2010). For these reasons, the Baltimore IJ concluded Atemnkeng had not established her eligibility for asylum.

On August 9, 2017, approximately one week after when the hearing would have occurred, Atemnkeng appealed the Baltimore IJ's ruling. She argued that the Baltimore IJ erred in denying her asylum application by concluding that she was not credible without "the required credibility finding," A.R. 17, that she failed to present independent evidence of past persecution, or that she failed to present credible evidence of a likelihood of future

10

persecution. She also argued that the Baltimore IJ erred in denying her applications for withholding of removal and relief under the CAT where significant objective and subjective credible, corroborative evidence was in the record. On July 5, 2018, the BIA affirmed, without opinion, the Baltimore IJ's rulings. Atemnkeng now petitions for review the BIA's decision to us.

## II.

Where, as here, the BIA affirms the IJ's decision without its own opinion, we review the IJ's order, treating it as a final agency determination and the BIA's own reasoning. *Haoua v. Gonzales*, 472 F.2d 227, 231 (4th Cir. 2007). In doing so, we review legal conclusions *de novo*. *Crespin-Valladares v. Holder*, 632 F.3d 117, 124 (4th Cir. 2011). We, however, review factual findings for substantial evidence, treating them "as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014) (internal quotation marks and citation omitted). We are bound to uphold the IJ and BIA's determinations unless they are manifestly contrary to the law or an abuse of discretion. *See Lizama v. Holder,* 629 F.3d 440, 444 (4th Cir. 2011). The BIA abuses its discretion by failing "to offer a reasoned explanation for its decision, or if it distort[ed] or disregard[ed] important aspects of the applicant's claim." *Cordova*, 759 F.3d at 337.

11

III.

Atemnkeng raises several issues on appeal. First, she argues that the BIA violated her due process rights by summarily affirming the Baltimore IJ's ruling and without issuing its own opinion. Second, she argues the Baltimore IJ also violated her due process rights by not affording her an opportunity to testify on remand, in direct conflict with the BIA's instructions. Third, she contends the BIA erred in upholding an adverse credibility determination where the Baltimore IJ did not observe her and failed to give her an opportunity to testify. She finally contends the denial of her applications for withholding of removal and relief under the CAT were erroneous. We address each argument in turn.

A.

We begin with Atemnkeng's challenge to the BIA's summary affirmance of the Baltimore IJ's rulings. Her main contention is that the BIA's summary affirmance was devoid of a closer look at her submitted evidence, simply accepting the Baltimore IJ's rulings at face value and in violation of her due process rights. We disagree.

The Attorney General has broad powers as to "the administration and enforcement of [the Immigration and Nationality Act ("INA")] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). The INA specifically empowers the Attorney General to "establish such regulations . . . as he deems necessary for carrying out his authority" under the immigration laws, including adopting any "regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]." 8 U.S.C. §§ 1103(a)(3), § 1158(d)(5)(B). And pursuant to those powers under the INA, the Attorney General issued regulations

12

creating the BIA as the administrative appellate body for asylum cases and setting forth a streamlined review process. *See* 8 C.F.R. § 1003.1(a)(1), (e)(4).

Indeed, we previously reviewed the streamlining regulations and concluded that they "are a permissible construction of the INA and permit the Attorney General to fulfill his legislatively delegated functions." *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278–83 (4th Cir. 2004). We also considered the same arguments now raised by Atemnkeng, namely, that "an affirmance of an Immigration Judge without opinion violates [a petitioner's] due process rights," and rejected the claim that the streamlining process itself deprived a petitioner of her due process rights. *Id.* at 281.

So contrary to Atemnkeng's arguments, the fact that the BIA issued a summary affirmance of the Baltimore IJ's rulings does not violate her due process rights. *See, e.g.*, *Dieng v. Mukasey*, 284 F. App'x 2, 8 (4th Cir. 2008) (per curiam) (reviewing the merits of the BIA's summary affirmance of an IJ's denial of applications for asylum, withholding of removal, and protection under the CAT); *Tougnon v. Gonzales*, 130 F. App'x 643, 644 (4th Cir. 2005) (per curiam) ("[W]e reject Tougnon's claim that he was denied due process by the Board's use of its summary affirmance procedure to affirm the decision of the IJ."). Indeed, Atemnkeng has not pointed to any specific reason about her case that would have prevented the BIA from relying on its streamlined review process. Nor does she even acknowledge our holding in *Blanco de Belbruno*.

B.

We turn next to Atemnkeng's argument that she was deprived of her due process rights by not being afforded an opportunity to testify. As noted above, though a master

13

calendar hearing was scheduled for August 1, 2018, the Baltimore IJ issued his rulings on July 12, 2018. According to Atemnkeng, as a result of the early rulings, she was not given the chance to provide oral testimony, address any alleged discrepancies in the record, or offer additional corroborating evidence where needed. The Baltimore IJ instead took away any opportunity for her to be heard, directly in conflict with the BIA's instructions that she be afforded a further opportunity to explain any inconsistencies "at a meaningful time and in a meaningful manner." *See* Pet. Br. at 10.

Prior to addressing Atemnkeng's arguments, "[w]e first consider whether we have jurisdiction" over her petition for review. *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). The Government contends Atemnkeng did not administratively exhaust her claim because she failed to raise it before the BIA. We disagree with the Government and conclude that Atemnkeng has adequately fulfilled the exhaustion requirement.

It is true we may review a final agency order only if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). Any particular claim that is not properly exhausted is barred from review, and this prohibition against reviewing unexhausted claims is jurisdictional. *See Massis v. Mukasey*, 549 F.3d 631, 638 (4th Cir. 2008); *Etienne*, 813 F.3d at 138 (quoting § 1252(d)(1)) ("When an alien has an opportunity to raise a claim in administrative proceedings but does not do so, he fails to exhaust his administrative remedies as to that claim.").

But, an appellant, like Atemnkeng, need not conjure any "magic words" to raise an issue and simply needs to "launch[ ] the appropriate argument and thus should *not be penalized* by evaluating form over substance." *Hanna v. Lynch*, 644 F. App'x 261 (4th

14

Cir. 2016) (emphasis added) (rejecting the government's argument the appellant "waived any argument as to whether the DHS proved by clear and convincing evidence that Hanna was subject to removal"). In *Ramirez v. Sessions*, for instance, we held that the administrative exhaustion does not bar a petitioner "from making more specific and nuanced points" related to a particular issue. 887 F.3d 693, 700 (4th Cir. 2018) (rejecting the government's position that a petitioner cannot "cit[e] certain cases for the first time on appeal in order to elaborate on the breadth of" her argument). We instead emphasized that administrative exhaustion bars consideration of "general issues that were not raised below." *Id.*

Contrary to the Government's contention then, Atemnkeng in substance raised the concern over a lack of a hearing in her appeal to the BIA. For instance, in arguing the Baltimore IJ "misunderstood the evidence due to the court's perception that . . . [she] may have exaggerated her claim and may not be credible," Atemnkeng stated that the Baltimore IJ had "failed to consider *all* of her detailed testimony." A.R. 33 (emphasis added). Atemnkeng also noted that the Baltimore IJ erroneously concluded that she is not credible and that the Baltimore IJ "failed to consider and analyze the totality of the evidence, but, instead, focused on little, insignificant concerns or distractions." A.R. 29. Atemnkeng further noted that "absent a finding that an appellant's *(whole)* testimony is not credible[,] the testimony must be accepted as true." *Id.* (emphasis added).

Indeed, Atemnkeng repeatedly reaffirmed that the Baltimore IJ failed to consider her new testimony—because she was not given the opportunity to testify—and that, under relevant Fourth Circuit precedent, "at a minimum the IJ must consider the petitioner's

15

explanation for any inconsistency to verify that an inconsistency actually exists, and then evaluate whether the discrepancy *renders the entire testimony incredible* in light of the record as a whole." A.R. 36 (emphasis added); *see also* A.R. 38 ("In determining credibility, the immigration judge, and consequently the Board, must take into account *both the Respondent's testimony and his or her corroborating evidence*, whether documentary or testimonial.") (emphasis added); A.R. 33 (arguing the IJ "committed reversible error in placing an unjust, unreasonable and improper burden on [her] . . . to explain the alleged minor inconsistencies in her statements, which *she attempted to do*") (emphasis added). In other words, Atemnkeng sought to have the Baltimore IJ consider all evidence relevant to her asylum application, including her new testimony, but was unreasonably deprived of that opportunity. So, while Atemnkeng did not conjure up "magic words" to explicitly state the Baltimore IJ failed to give her the chance to testify, her arguments before the BIA in essence raised the concern that she was unable to do so.[6]

Turning to the merit of Atemnkeng's arguments, "[t]o succeed on a procedural due process claim, [she] must demonstrate (1) that a defect in the proceeding rendered it fundamentally unfair and (2) that the defect prejudiced the outcome of the case." *Nardea v. Sessions*, 876 F.3d 675, 681 (4th Cir. 2017). This Court may find prejudice where "the

---

[6] To the extent there are lingering ambiguities in Atemnkeng's brief to the BIA, courts have generally construed them in favor of the removable applicant given the drastic potential consequences in the immigration context. *See, e.g.*, *Bovovo v. Ashcroft*, 120 F. App'x 936, 939 n.8 (4th Cir. 2010) (per curiam) (ambiguity in regulation); *Elias-Zacarias*, 502 U.S. at 488 (Stevens, J., dissenting) ("Similar reasoning should resolve any doubts concerning the political character of an alien's refusal to take arms against a legitimate government in favor of the alien.").

rights of an alien have been transgressed in such a way as is likely to impact the results of the proceedings." *Rusu v. INS*, 296 F.3d 316, 320 (4th Cir. 2002) (internal quotation marks and citation omitted).

As to fundamental unfairness, the Government's main contention is Atemnkeng waived the opportunity to have any hearing. The Government reasons that Atemnkeng was given a choice between submitting an affidavit or have a hearing, and she voluntarily chose *only* to submit an affidavit. But this is an incorrect assessment of what the Baltimore IJ informed Atemnkeng. As discussed above, the Baltimore IJ allowed Atemnkeng to submit an affidavit *and* scheduled a master calendar hearing for August 1, 2018. It is unreasonable for Atemnkeng to have understood that by submitting an affidavit prior to that scheduled hearing, she was intentionally and voluntarily waiving it. *See Appleby v. Warden, N. Reg'l Jail and Corr. Facility*, 595 F.3d 532, 541 (4th Cir. 2010) ("For [a] waiver to be valid under the Due Process Clause, it must be an *intentional relinquishment* or *abandonment* of a known right or privilege.") (citations and quotation marks omitted). Nor did the Baltimore IJ confirm with Atemnkeng that she was intentionally and voluntarily relinquishing her right to testify by submitting a supporting affidavit.

Moreover, inherent under the first prong is whether the evidence is "probative," or whether Atemnkeng's testimony at a hearing would have likely shed light into an important aspect of her asylum application. *See Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008) (concluding that an IJ's reliance on DHS's letter that contains insufficient indicia of reliability "was fundamentally unfair"). There is little doubt Atemnkeng's new testimony would have been probative to her asylum application. Indeed, the BIA remanded the case

17

to the Baltimore IJ specifically for the purpose of determining her credibility in light of the various inconsistencies in the record.

As to prejudice, the Government argues that Atemnkeng failed to establish any prejudice by stating how a hearing is likely to have led to a different result. But, contrary to the Government's contention that Atemnkeng failed to identify how a hearing would have changed her adverse credibility determination, she expressly states that she "would have resolved any inconsistencies, discrepancies, and omissions the immigration judge believed existed." Pet. Br. at 12. Atemnkeng also states that she was the only person who could have "allayed any of the immigration judge's concerns," *id.*, given that she was the one persecuted in Cameroon. She could have explained, for instance, about the lack of certain supporting evidence of her persecution and why, six years after numerous traumatic incidents, she was unable to accurately remember all of the details of her persecution. *See Roblero-Morales v. Boente*, 677 F. App'x 849, 852 (4th Cir. 2017) (per curiam) (recognizing that due process mandates "a *meaningful opportunity* to present a claim") (emphasis added); *see also Capric v. Ashcroft*, 355 F.3d 1075, 1087–88 (7th Cir. 2004) (concluding prejudice occurs when the due process transgression is "likely to impact the results of the proceedings").

Indeed, the BIA has even emphasized how important it is for an IJ to consider an applicant's live testimony:

> [W]e consider the full examination of an applicant to be an essential aspect of the asylum adjudication process for reasons related to fairness to the parties and to the integrity of the asylum process itself. We note that there are often significant differences (either discrepancies or meaningful omissions)

18

between the written and oral statements in an asylum application; *these differences cannot be ascertained unless an applicant is subjected to direct examination.* Moreover, if an applicant is not fully examined under oath there would seldom be a means of detecting those unfortunate instances in which an asylum claim is fabricated.

*Matter of Fefe*, 20 I&N Dec. 116, 118 (BIA 1989) (emphasis added).[7] It is difficult to imagine how Atemnkeng's live testimony would not have likely added something probative to the record as a whole.

Because the Baltimore IJ explained that his denial of Atemnkeng's asylum claim turned on the various inconsistencies in her application, we conclude that his failure to consider her testimony on remand—in direct conflict with the BIA's instructions—prejudiced the outcome of Atemnkeng's asylum claim. Atemnkeng has therefore demonstrated a violation of her due process right. In light of our conclusion that the Baltimore IJ improperly failed to give Atemnkeng an opportunity to testify and consider the relevance of that testimony, we decline to address whether the adverse credibility determination and the denial of her applications for withholding of removal and relief under the CAT were erroneous.

---

[7] Indeed, other circuits have similarly emphasized that the exclusion of live testimony *is* prejudicial when the testimony would have added something that was otherwise missing from the record. *See, e.g.*, *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003) ("[T]he immigration judge violates due process by barring complete chunks of oral testimony that would support the applicant's claims."); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (remanding where the IJ did not allow the applicant to testify about anything in his written application).

IV.

For the foregoing reasons, we grant Atemnkeng's petition for review. She has adequately demonstrated that she was improperly deprived of an opportunity to testify. We thus vacate the BIA's summary affirmance of the Baltimore IJ's rulings and remand for reconsideration of Atemnkeng's asylum claim, which includes affording her an opportunity to testify and appropriate consideration of that testimony as well as any factual determinations.

*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*