**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2066**

———————

TROKON MORRIS DIAHN,

Petitioner,

v.

TODD BLANCHE, Acting Attorney General,

Respondent.

———————

**No. 24-2154**

———————

TROKON MORRIS DIAHN,

Petitioner,

v.

TODD BLANCHE, Acting Attorney General,

Respondent.

———————

**No. 25-1692**

———————

TROKON MORRIS DIAHN,

Petitioner,

v.

TODD BLANCHE, Acting Attorney General,

Respondent.

———————

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued: January 29, 2026                    Decided: May 5, 2026

---

Before GREGORY, HEYTENS, and BENJAMIN, Circuit Judges.

---

Petition granted, order vacated and remanded with instructions by published opinion. Judge Gregory wrote the opinion, in which Judge Benjamin joined. Judge Heytens wrote a separate opinion, concurring in the judgment in part and dissenting in part.

---

**ARGUED:** Sahar R. Atassi, COOLEY LLP, Washington, D.C., for Appellant. Gerald M. Alexander, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brett A. Shumate, Assistant Attorney General, Leslie McKay, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

2

GREGORY, Circuit Judge:

Trokon Diahn, a twenty-year-old man, was born in Cote d'Ivoire after his parents fled Liberia during the civil war. He left Cote d'Ivoire with his family when he was two years old and settled in the United States. But, unlike his parents, he never acquired lawful permanent resident status. Though he has spent his entire life in the United States and has no connection to Liberia, he is now facing removal to Liberia.

Diahn's proceedings before the Immigration Judge ("IJ") and the Bureau of Immigration Appeals ("Board") were fraught. Diahn came before the IJ pro se, so he had limited understanding of the legal standards he needed to meet and the evidence necessary to corroborate his claims. He was also incarcerated throughout his interactions with the IJ. Due to confusing communications from the IJ, Diahn sent relevant documentary evidence in support of his applications for relief to the incorrect immigration court. With an inadequate record before it, the IJ denied relief on all grounds. On appeal before the Board, and hampered by ineffective counsel, Diahn was unable to adequately present his claims, and his appeal was dismissed in full by the Board. He petitions for this Court's review of the Board's decision.

Diahn argues that he did not receive a full and fair hearing before the IJ. We agree. For the reasons below, we grant Diahn's petition for review, vacate the Board's determination, and remand for further proceedings.[1]

---

[1] Because we grant the lead petition for review in Diahn's case, No. 24-2066, and vacate the underlying order, we dismiss Diahn's remaining petitions for review, Nos. 24-2154 and 25-1692, as moot.

3

I.

Diahn was born in a refugee camp in Cote d'Ivoire. During the Second Liberian Civil War, Diahn's uncle, a military officer, was killed by rebel groups. Diahn's other relatives were also targeted by rebel groups; his mother, for instance, was detained and interrogated while she was pregnant with him. As a result, Diahn's family fled Liberia for Cote d'Ivoire before Diahn was born. Diahn's family later left Cote d'Ivoire for the United States, where Diahn was admitted as a refugee when he was two years old, along with his parents and siblings. His father is a naturalized United States citizen, and his mother is a lawful permanent resident. Diahn, however, lacked permanent legal status, which he did not learn until he received notice decades later that he was subject to removal proceedings.

Diahn is bisexual, and fears persecution and violence because of his identity if he returns to Liberia. He has never visited Liberia and has no network there. Diahn is also very close to his family, so his deportation would negatively impact them. He also fears being targeted because of his family, in part because his father's business associates had threatened to inflict harm on Diahn's family due to a business dispute.

II.

At the time his immigration proceedings began, Diahn was incarcerated in Pennsylvania due to two criminal convictions. While incarcerated, the DHS filed a Notice to Appear in Baltimore Immigration Court, charging Diahn deportable because of his convictions. These convictions included: (1) conviction of an attempt or conspiracy to commit an aggravated felony, 8 U.S.C. §§ 1101(a)(43)(U), 1227(a)(2)(A)(iii); (2) conviction

4

for two crimes involving moral turpitude not arising from a single scheme of criminal misconduct, 8 U.S.C. § 1227(a)(2)(A)(ii); and (3) conviction for an aggravated felony involving fraud or deceit with a loss exceeding $10,000, 8 U.S.C. §§ 1101(a)(43)(M), 1227(a)(2)(A)(iii).[2]   These convictions rendered Diahn deportable. 8 U.S.C. § 1227(a)(2)(A)(ii)-(iii).  But though the Notice to Appear stated that proceedings would occur in Baltimore Immigration Court, they were all conducted virtually—the IJ initially handling his case, IJ Golparvar, was located in Pennsylvania.

Diahn appeared at several remote hearings noticed for Baltimore Immigration Court between January and October 2023.  He sought four overlapping forms of relief:  a waiver of inadmissibility in connection with his adjustment-of-status application under 8 U.S.C. § 1159(c); asylum, which requires proof of past persecution or a well-founded fear of future persecution based on a protected ground, such as race, religion, political opinion, or membership in a "particular social group," 8 U.S.C. § 1101(a)(42)(A); withholding of removal under 8 U.S.C. § 1231(b)(3); and Convention Against Torture (CAT) deferral under 8 C.F.R. § 1208.16(c)(2).  Diahn repeatedly voiced confusion with the process. *See* J.A. 488 ("I thought today was supposed to be like the final order or something."); J.A. 497 ("[E]very time I come to . . . the court, I was trying to figure out when is going to be like

---

[2] At the time, the Baltimore Immigration Court served as the designated administrative court for Pennsylvania state prisons, where Mr. Diahn was incarcerated. Executive Office for Immigration Review, EOIR Immigration Court Listing (Administrative Control List), (archived Dec. 7, 2022), https://www.justice.gov/eoir/immigration-court-administrative-control-list; https://perma.cc/739X-3D28 (last visited March 31, 2026).

the resolution because it's . . . mentally giving me anxiety every time I come down here and not knowing what's going on.").

At an August 2023 hearing, however, Diahn was told for the first time that his proceedings would take place in the Philadelphia Immigration Court:

> **IJ GOLPARVAR TO DIAHN** To the respondent, sir, if you have any additional documents in support of your application, *please start sending them to me* but they'll now need to be sent to the Philadelphia immigration court going forward. Your case was transferred to that court. Any additional documents such as letters of support, country reports, newspaper articles, anything in support of your application for your green card, and then also because you're also applying for protection, withholding of removal, and Convention Against Torture, anything that will support your claim of being harmed in Liberia, any and all of those documents will be due by September 26th at the Philadelphia immigration court, okay?
>
> **DIAHN TO IJ GOLPARVAR** So, September 6th and not—but I thought it was October 6th, I mean, not October 6th–
>
> **IJ GOLPARVAR TO DIAHN** Yeah, it is
>
> **DIAHN TO IJ GOLPARVAR** –on the last paper I got, it said, like, I had to submit my evidence before the 6th of September.
>
> **IJ GOLPARVAR TO DIAHN** If you're able to get it all in by the 6th of September, that's even better. So, yes, that is—that date is still correct. *If you need a little bit more time to get your evidence in, I'll provide that to you.* That won't be a problem.

J.A. 519–520 (emphasis added). Before his merits hearing, Diahn mailed his supporting documents to Baltimore Immigration Court. Although IJ Golparvar stated the merits hearing was scheduled for October 6, 2023, it was held on October 12, 2023. No justification for this change is in the record.

On October 12, the merits hearing occurred virtually before IJ McDermott at the Philadelphia Immigration Court. Diahn, still detained, attended virtually. At the hearing,

6

Diahn expressed bewilderment at several junctures. When IJ McDermott asked Diahn how many witnesses he had brought to the virtual hearing, Diahn replied, "I didn't even know you bring witnesses, so none." J.A. 534–35. IJ McDermott likewise asked Diahn questions about Diahn's background and family circumstances, but when Diahn attempted to offer more information, the IJ cut him off: "I want you to just take a breath . . . there is a method to the questions I ask." J.A. 539. IJ McDermott also did not describe the legal standards applicable to Diahn's four immigration claims, even though Diahn appeared pro se before the IJ in the merits hearing.

At the conclusion of the merits hearing, IJ McDermott issued a decision denying Diahn all relief and ordering removal. First, he determined that Diahn's waiver of inadmissibility was subject to a heightened standard because Diahn's aggravated assault conviction rendered him "violent or dangerous," based on the conviction itself and the underlying conduct. J.A. 411. Then, as required under *In Re Jean*, 23 I&N Dec. 373, (A.G. 2002), the IJ weighed the impact that both Diahn and his family would suffer upon his removal and found it did not meet the heightened standard of "exceptional and extremely unusual" hardship. J.A. 412–13. The IJ also stated that Diahn had not established that he merited waiver based on the IJ's discretionary balancing of the equities.

Next, IJ McDermott denied asylum on multiple grounds. First, IJ McDermott noted that applicants have to prove by "clear and convincing evidence" that their asylum application was filed within one year of the date of their arrival to the United States. 8 U.S.C. § 1158(a)(2)(B). J.A. 415. The IJ determined that Diahn failed to meet either exception to the one-year bar, so his application for asylum should be denied. In the

7

alternative, the IJ found that Diahn's bank fraud conviction constituted a per se particularly serious crime, which rendered him ineligible for asylum relief. He also found that Diahn failed to establish an objective well-founded fear of future persecution because he had "not corroborated his claim with respect to this issue." J.A. 416. The IJ stated he considered Diahn's "particular social groups of member of the LGBTQ community, bisexual person, and son of the respondent's father," alongside his race and nationality. J.A. 417. But the IJ nonetheless stated that Diahn did not adequately establish a "slight though discernible chance of future persecution" as to these "protected classes." J.A. 417. Finally, he denied asylum on discretionary grounds.

IJ McDermott also denied withholding of removal on statutory grounds, again stating that Diahn's bank fraud conviction was a particularly serious crime, rendering him ineligible for statutory withholding.

The IJ then moved to Diahn's claims under CAT. CAT proscribes removal to a country where it is "more likely than not" the applicant will be tortured by, or with the acquiescence of, a public official. 8 C.F.R. §§ 1208.16–18. There are two forms of relief under CAT: CAT withholding of removal and CAT deferral of removal. 8 C.F.R. § 1208.16(c)(4). For CAT withholding, the IJ again said that the particularly serious crime bar rendered Diahn ineligible. On the merits of CAT deferral, which is not precluded by criminal convictions, 8 C.F.R. § 1208.17(a), the IJ stated that Diahn failed to establish a likelihood of torture in Liberia based on either Diahn's identity as a member of the LGBTQ community or his connection to his father. Nor did IJ McDermott find specific evidence tying any threat of harm to government actors in Liberia, as necessary for a CAT claim.

8

Diahn, after retaining counsel, timely appealed IJ McDermott's determinations to the Board. He raised four issues on appeal:

 (1) For Diahn's adjustment-of-status application, the IJ erroneously concluded that Diahn was convicted of a particularly serious crime without engaging in the required individualized analysis.

 (2) The IJ erred in denying Diahn's adjustment-of-status waiver application by applying a heightened discretionary standard based on Diahn's juvenile record, rather than engaging in a fact-specific inquiry.

 (3) The IJ failed to apply necessary safeguards to Diahn's hearing because he was not sufficiently competent to proceed with the removal proceedings.

 (4) The IJ denied Diahn his "statutory and due process right to a fundamentally fair hearing" by failing to consider the evidence Diahn had mailed to the Baltimore Immigration Court three-and-a-half weeks before September 6.

J.A. 321–30.

The Board dismissed the appeal on April 17, 2024. First, it held that Diahn had waived his challenges to the denial of asylum because he did not address the timeliness ruling or the particularly serious crime bar in his appeal to the Board. It also held that, because Diahn's asylum claim failed on the merits, he necessarily could not meet his burden of proving eligibility for statutory withholding of removal. The Board then affirmed the IJ's discretionary denial of Diahn's waiver of inadmissibility application and rejected any argument as to the fundamental fairness of Diahn's hearing before IJ McDermott. Finally, it held that any argument challenging the denial of CAT protection was waived for failure to raise it on appeal to the Board.

Diahn, again pro se, timely petitioned for judicial review of the Board's dismissal. He also filed two motions to reopen. In the first, he discussed his prior counsel's failure to

9

appeal necessary issues and submit more evidence in his support.  His counsel in the Board hearing had also refused to communicate with him until three days before the deadline to file his petition for review.  Diahn further argued that IJ McDermott improperly held the merits hearing in Philadelphia, rather than Baltimore, therefore harming his case because he submitted his documentary evidence to Baltimore.

The Board denied the first motion to reopen as untimely on October 21, 2024, under 8 C.F.R. § 1003.2(c)(2), because, though Diahn submitted his motion to reopen a day before the statutory ninety-day deadline, it was not received until two days after the deadline.  The Board also held that Diahn had failed to sufficiently explain why his untimeliness was attributable to his ineffective counsel.  A few months later, after Diahn petitioned for our review, Diahn filed a second motion to reopen.  In his second motion to reopen, he expanded on the failures of his counsel and argued that his initial submission should be equitably tolled because of his issues with counsel and the impact of his detention on his ability to timely submit briefing.  The Board denied this motion as well, holding both that it was time-barred and that equitable tolling was not warranted because Diahn failed to adequately establish that he acted with the requisite diligence and that he was sufficiently prejudiced by the ineffective assistance of counsel and his detention.  Counsel for Diahn was appointed after Diahn submitted his two motions to reopen.

III.

A.

We have jurisdiction over Diahn's petition seeking review of a final order of removal, provided he has exhausted administrative remedies. 8 U.S.C. § 1252(d)(1). Though we generally lack jurisdiction to review removal orders against noncitizens convicted of an aggravated felony, 8 U.S.C. § 1252(a)(2)(C), we retain jurisdiction here because all issues presented are questions of law, including the application of law to settled facts. 8 U.S.C. § 1252(a)(2)(D); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227–28 (2020). We review these questions of law de novo. *Guerrero-Lasprilla*, 589 U.S. at 227–28.

B.

Diahn's removal proceedings were statutorily inadequate. Because Diahn failed to receive a full and fair hearing, we vacate the Board's determination and remand for further proceedings.[3]

To start, the Government argues that Diahn failed to raise, and therefore failed to exhaust, his record-development claim before the Board. While Congress has limited our jurisdiction to consider final orders of removal, we retain jurisdiction "to review constitutional claims or questions of law" if the petitioner has complied with the administrative exhaustion requirement. 8 U.S.C. § 1252(a)(2)(D). Though we previously recognized that this rule was jurisdictional, the Supreme Court held in *Santos-Zacaria v.*

---

[3] Because we grant Diahn's petition on the grounds that the IJ failed to fulfill its statutory duty to develop the record, we do not reach the merits of his other arguments on appeal.

11

*Garland*, 598 U.S. 411, 416 (2023) that exhaustion in the immigration context is a claims-processing rule, so it is subject to the traditional rules of forfeiture and waiver.

A court may only review a final order of removal if the noncitizen has "exhausted all administrative remedies available" to the noncitizen. 8 U.S.C. § 1252(d)(1). "The exhaustion doctrine serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Portillo Flores v. Garland*, 3 F.4th 615, 632 (4th Cir. 2021) (en banc). But the exhaustion requirement "only prohibits 'the consideration of . . . general issues that were not raised below," and "not of specific, subsidiary legal arguments, or arguments by extension, that were not made below.'" *Ramirez v. Sessions*, 887 F.3d 693, 700 (4th Cir. 2018) (citing *Gill v. INS*, 420 F.3d 82, 86 (2d Cir. 2005)). Our precedent makes clear that a noncitizen's filings must alert the Board "in substance" to the noncitizen's claims and does not require he use "magic words." *Atemnkeng v. Barr*, 948 F.3d 231, 240 (4th Cir. 2020).

Petitioners satisfy the exhaustion requirement when they "in essence raise[] the concern before the Board," *id.*, even if they do not argue the exact contours of the argument ultimately raised before the court. *See Higgs v. Atty. Gen. of the U.S.*, 655 F.3d 333, 338 (3d Cir. 2011) (explaining that petitioner satisfied exhaustion requirement where he made "some effort, however insufficient, to place the Board on notice of a straightforward issue being raised on appeal") (citation omitted); *Dale v. Holder*, 610 F.3d 294, 299 (5th Cir. 2010) (stating that a petitioner need only "ma[ke] some concrete statement before the Board to which [he] could reasonably tie [his] claims before this court") (alteration in original) (citing *Omari v. Holder*, 562 F.3d 314, 322 (5th Cir. 2009), *abrogated on other*

12

*grounds by Santos-Zacaria v. Garland*, 598 U.S. 411 (2023)); *Restrepo v. McElroy*, 369 F.3d 627, 633 n.10 (2d Cir. 2004) (noting that exhaustion requirement did not prevent court from considering new reliance argument on appeal because petitioner "raised the *general* issue of the AEDPA's retroactivity" below, and the court "enjoy[s] broad discretion to consider subsidiary legal arguments that were not specifically raised below").

Diahn explicitly stated in his Board brief that the IJ "violated his statutory and due process right to a fundamentally fair hearing" because he was "denied the right to corroborate his claim in the removal proceedings" before the IJ.  J.A. 330.  In *Quintero v. Garland*, we recognized that immigration judges have a duty to develop the record in immigration court proceedings.  998 F.3d 612, 622 (4th Cir. 2021).  Diahn's statement that he did not receive a full and fair hearing and was denied the right to corroborate his claims, in violation of his statutory rights, placed the Board on notice that the IJ failed to comply with 8 U.S.C. § 1229a(b)(1)'s requirements and preserved the argument for our review.

In a separate section, Diahn also stated that he "did not understand his obligations to corroborate his application or was unable to do so."  J.A. 328.  While Diahn raised this in the context of his competency argument, this statement also put the Board on notice that Diahn did not understand how to support his claims, rendering the IJ's statutory failure all the more damaging.  Diahn's lack of understanding of what was required of him is clear from the record:  the record is devoid of country conditions research, evidence supporting his applications for relief, or any witness affidavits or testimony.

Of course, where a noncitizen fails to make *any* substantive argument that would have placed the Board on notice of their claim, that claim is unexhausted.  In *Perez Vasquez*

13

*v. Garland*, for example, we determined that a noncitizen's CAT claim was not exhausted because they had made *no* argument that would place the Board on notice that the noncitizen was raising a CAT claim. 4 F.4th 213, 228 (4th Cir. 2021). In contrast, Diahn discussed the fundamental unfairness he experienced before the IJ in the brief he submitted to the Board. His brief provided the Board with sufficient opportunity to correct any error by the IJ. *See Kurfees v. I.N.S.*, 275 F.3d 332, 336 (4th Cir. 2001).[4]

Accordingly, Diahn adequately exhausted his statutory failure-to-develop claim, so we may move to the merits of his claim.

## C.

We agree with Diahn that both IJs failed to fulfill their obligation to develop the record as to Diahn's claims, particularly given his incarcerated and pro se status. *See* 8 U.S.C. § 1229a(b)(1), (b)(4)(B). In doing so, we are guided by our precedent in *Quintero*, 998 F.3d at 622–27. In *Quintero*, we detailed the reasons for imposing this weighty duty on immigration judges, drawing on a robust consensus long-established in other circuits. The statutory duty—distinct from the constitutional due process protections accorded to a litigant—arises from the Immigration and Nationality Act, which requires that immigration judges "'administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses" in removal proceedings.'" *Id.* at 623 (citing 8 U.S.C. § 1229a(b)(1)). So, "unlike an Article III judge," an immigration judge "is not merely the

---

[4] We are likewise satisfied that judicial efficiency poses no barrier in Diahn's case. A failure-to-develop claim requires no fact-finding, so the existing record of the proceedings before the IJ suffices for our review.

14

fact finder and adjudicator but also has an obligation to establish the record." *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) (citing 8 U.S.C. § 1229a(b)(1)). Indeed, "'a cooperative approach in Immigration Court is particularly appropriate," so immigration judges "have a role in introducing [relevant] evidence into the record.'" *Quintero*, 998 F.3d at 625 (citing *S-M-J-*, 21 I. & N. Dec. 722 (B.I.A 1997)).

We also joined the Second and Seventh Circuits to hold that, while this duty applies in all cases before an immigration judge, it is paramount in cases involving pro se noncitizens like Diahn. *Id.* at 622 n.8. Pro se individuals in removal proceedings have a "particularly strong need for procedural protections, without which they would not be able to 'receive a meaningful hearing.'" *Id.* at 627 (citing *Rusu v. INS*, 296 F.3d 316, 321 n.7); *see id.* (holding that "immigration judges' duty to fully develop the record—while applicable in all cases—becomes especially crucial in cases involving unrepresented noncitizens"). Pro se litigants may lack "English proficiency and relevant legal knowledge," which is particularly harmful in the "abstruse" context of immigration law. *Id.* Given the "gravity of the interests at stake," immigration judges must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* (citing *Agyeman v. I.N.S.*, 296 F.3d 871, 877 (9th Cir. 2002)). Because "many [noncitizens] are uncounselled, our removal system relies on IJs to explain the law accurately to *pro se* [noncitizens]." *United States v. Copeland*, 376 F.3d 61, 71 (2d Cir. 2004) *abrogation recognized by United States v. Mejia*, No. 24-3086-cr, 2026 WL 958828 at *5 (2d Cir. 2026). "'Otherwise, such [noncitizens] would have no way of knowing what information

15

was relevant to their cases and would be practically foreclosed from making a case against removal.'" *Quintero*, 998 F.3d at 627–28 (quoting *Copeland*, 376 F.3d at 71).

Thus, "immigration judges' duty to develop the record includes adequately explaining the hearing procedures and the relevant legal requirements in plain language." *Id.* at 629. They must "provide . . . sufficient guidance as to how [noncitizens] may prove the elements of their claims—i.e., "what evidence will demonstrate their eligibility for relief from deportation" and "in what form that evidence could be presented." *Id.* (alteration in original) (citing *Agyeman*, 296 F.3d at 883–84). So immigration judges must do "more than just asking a specific number of relevant questions." *Id.* And even when immigration judges ask relevant questions, "'the superficial quality of the questioning" may nonetheless deprive a noncitizen of a full and fair hearing.'" *Id.* (citing *Mendoza-Garcia v. Barr*, 918 F.3d 498, 507 (6th Cir. 2019)). Moreover, immigration judges may not "circumscrib[e] [a noncitizen's] ability to elaborate on the details of his claim by instructing him only to answer the questions asked." *Id.* (alteration in original) (citing *Al Khouri v. Ashcroft*, 362 F.3d 461, 465 (8th Cir. 2004)). To ensure compliance with this statutory duty, we scrutinize the decisions of the immigration judge on a case-by-case basis. *See id.* at 630.

Consequently, we emphasized that failing to provide noncitizens in removal proceedings the procedural protections to which they are entitled is "presumptively prejudicial." *Id.* at 642. An immigration judge's "failure to fully develop the record" on an issue "material" to the noncitizen's claim is "not an error amenable to the ordinary prejudice inquiry" because the noncitizen cannot "'produce a record that does not exist.'"

16

*Id*. (citing *Agyeman*, 296 F.3d at 885). The reviewing court cannot assess whether prejudice exists as it otherwise would because the immigration judge's error "hamper[s] the ability of the reviewing court to assess whether and how the applicant was prejudiced." *Id.* at 643.

As noted above, Diahn sought four overlapping forms of relief from the IJs. We will briefly address each below.

First, Diahn sought a waiver of inadmissibility in connection with his adjustment-of-status application under 8 U.S.C. § 1159(c). This waiver may be granted "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.* Relief under 8 U.S.C. § 1159(c) requires a showing of "exceptional and extremely unusual hardship" if any of Diahn's prior convictions were considered to be "violent or dangerous." 8 C.F.R. § 1212.7(d).

Second, Diahn raised an asylum claim, which requires proof of past persecution or a "well-founded fear" of persecution based on a protected ground, such as "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An individual seeking asylum must establish both a subjective and objective "well-founded fear" of persecution, thus requiring the noncitizen corroborate their claim with both subjective and objective evidence. *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010). "The subjective component is satisfied by presenting candid, credible, and sincere testimony demonstrating a genuine fear of persecution, while "[t]he objective element requires the asylum [applicant] to show, with specific, concrete facts, that a reasonable person in like circumstances would fear persecution." *Id.* (citations

17

omitted). Importantly, an asylum claim is subject to a one-year filing deadline and a "particularly serious crime bar." 8 U.S.C. §§ 1158(a)(2)(B), 1158(b)(2)(A)(ii).

Third, Diahn raised a withholding of removal claim under 8 U.S.C. § 1231(b)(3), which, similar to a claim for asylum, requires proof that he will "more likely than not" have his life or freedom threatened because of his "race, religion, nationality, membership in a particular social group, or political opinion" if he returns to Liberia. *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009).

Finally, Diahn sought CAT deferral under 8 C.F.R. § 1208.16(c)(2), which requires proof that it is "more likely than not" he would be tortured by, or with the consent or acquiescence of, the government of Liberia. *See Moreno-Osorio v. Garland*, 2 F.4th 245, 256 (4th Cir. 2021); 8 C.F.R. § 1208.16(c)(2).

After a careful review of the record, we hold that the IJs below failed to fulfill their statutory duty. These failures fall into two buckets: the IJ's failure to ensure relevant evidence entered the record and the IJ's failure to elicit relevant facts and apprise Diahn of the relevant legal standards. We will discuss both in turn.

i.

First, the IJ failed to ensure relevant evidence entered the record. IJs must "[e]nsure that the applicant presents his case as fully as possible and with all available evidence." *Quintero*, 998 F.3d at 625 (alteration in original) (citing *S-M-J-*, 21 I. & N. Dec. at 729 (B.I.A. 1997)). *See* 8 C.F.R. § 240.10(a)(4) (providing that alien will have a reasonable opportunity to present evidence).

18

IJ Golparvar failed to advise Diahn regarding "'what evidence will demonstrate [his] eligibility for relief . . .' and 'in what form that evidence could be presented.'" *Quintero,* 988 F.3d at 629 (quoting *Agyeman,* 296 F.3d at 883–84). Before Diahn's merits hearing, IJ Golparvar discussed categories of relevant evidence, such as country conditions reports and police records. But he failed to explain what evidence would allow Diahn to establish eligibility for relief based on his specific claims. For example, he did not tell Diahn that Diahn would need objective evidence to substantiate his claims. IJ McDermott asked Diahn for "objective evidence" like "photographs of [Diahn] with partners and invitations, receipts, things of this nature" to establish his membership in the LGBTQ community. J.A. 561. But Diahn had no such evidence, because he was never told he would need to provide that evidence.

Yet perhaps most damaging to Diahn's claims for asylum and CAT deferral, IJ Golparvar did not adequately notify Diahn of his right to bring witnesses to his merits hearing. At the initial calendar hearing in January—nine months before Diahn's merits hearing—IJ Golparvar told Diahn he would have "the right to submit evidence or witnesses in support of [his] case." J.A. 449. This statement, made in the middle of a long discussion by the IJ, was the only time Diahn was told about his ability to present witnesses. The failure is particularly concerning because, though Diahn had initially communicated that he planned to retain an attorney, he remained detained and unrepresented throughout his communications with IJ Golparvar about his hearing preparation. And the IJ's reminders to Diahn focused only on the applications and documents he was required to submit. That single remote statement from IJ Golparvar was insufficient.

19

Diahn's failure to provide this witness testimony harmed his case. When the IJ asked Diahn why he did not provide "objective evidence" or "witnesses" to corroborate his LGBTQ identity, Diahn responded that he did not know he could bring witnesses to the virtual conference. J.A. 561. Consequently, IJ McDermott explicitly recognized that he was suspicious of Diahn's claim of LGBTQ membership because Diahn did not provide evidence corroborating his membership. Without objective evidence to corroborate his claim that he belonged to the LGBTQ community, Diahn was ill-equipped to establish his membership in that particular social group.[5]

DHS and IJ Golparvar also did not tell Diahn *where* to submit his evidence. IJ Golparvar began by stating that Diahn could "start sending them to [him]," but that they would "now need to be sent to the Philadelphia immigration court going forward." J.A. 519–20. It is unclear from the record whether Diahn himself had to submit information to the Philadelphia Immigration Court, because IJ Golparvar initially encouraged Diahn to send them to him. Going further, IJ Golparvar told Diahn that if Diahn needed more time to submit his evidence, "[the IJ] would provide that to [Diahn]." J.A. 520. Diahn never received written notice of this change. Nor did he ever receive the precise address for the Philadelphia Immigration Court where he was expected to send his materials.

---

[5] We recognize that Diahn stated that he did not provide letters or affidavits from prior romantic partners because he "didn't want everybody to know [his] business." J.A. 561. But we read that statement in the broader context of Diahn's discussion that he would have provided witness testimony or other objective evidence if he was adequately informed of the manner in which that testimony would corroborate his claims. *See* J.A. 561 ("[I]f you needed like witness to show up, I'll be able to like produce like witness to support my story.").

Diahn—pro se, detained, and appearing virtually—could hardly ascertain that the Baltimore Immigration Court was no longer the appropriate locale for his submissions. We know he didn't. He discovered halfway through his merits hearing that IJ McDermott did not have the evidence Diahn had mailed to the only address the IJ had ever provided to him: the address of the Baltimore Immigration Court. J.A. 557 ("If I'm not mistakenly, early October, I sent [the evidence] to IJ Golparvar. I sent it directly to the courthouse, his room for 440 31 or 31 Hopkins Plaza in Baltimore."); *see* J.A. 331 (stating that he mailed his documentary evidence to IJ Golparvar's address "3 and a half week[s]" before the "Sept 6 of 2023" deadline). *See also* J.A. 65, J.A. 453–54, J.A. 460, J.A. 477, J.A. 478, J.A. 496, J.A. 501, J.A. 506, J.A. 511 (a year's worth of notices stating that Diahn should attend hearings and send filings to Baltimore Immigration Court). IJ Golparvar's single oral communication to Diahn created the uncertainty that ultimately prejudiced his case.

The submitted evidence included country conditions research, as well as letters discussing Diahn's bisexuality, his fear of harm if he returned to Liberia, and the hardship his removal would cause to his family. These documents would bolster the argument that his departure would impose an "exceptional and extremely unusual hardship" on his family, as necessary for his waiver of inadmissibility application. They would also support the "objective" prong of Diahn's asylum claim and provide further evidence of his membership in the LGBTQ community, as relevant to both his asylum and CAT claims. Because Diahn's documents never made it into the record, he was unable to fully make his case. To this day, it is unclear whether the Baltimore Immigration Court ever received Diahn's evidence.

21

Additionally, while the IJ and the Board did not have the opportunity to consider Diahn's letters because they were not part of the administrative record, we need not read those letters to find that Diahn was prejudiced by their exclusion. The IJ's failure to develop the record is "presumptively prejudicial" to a pro se litigant. *Quintero*, 998 F.3d at 642. When the record lacks necessary evidence because the IJ failed to fulfill its responsibility, the noncitizen is per se prejudiced by its absence.

### ii.

IJ McDermott's failure to elaborate on relevant legal standards and elicit key facts compounded the harm of Diahn's inadequate record. When Diahn asked about his waiver of inadmissibility in his October 12 hearing before the IJ, IJ McDermott stated that the issue was "whether or not [Diahn was] going to be able to demonstrate the hardship necessary for [him] to get the waiver," which is "a high burden." J.A. 532–33. The IJ never made clear that Diahn was required to meet a much higher standard of demonstrating that the denial of his adjustment-of-status application would result in an "exceptional and extremely unusual hardship" because he had been convicted of a "violent or dangerous" offense. 8 C.F.R. § 1212.7(d). Diahn was not told that he needed to prove hardship "substantially different from, or beyond, that which would normally be expected" to result from his removal. *Wilkinson v. Garland*, 601 U.S. 209, 222 (2024) (internal citations omitted). So, though the IJ allowed Diahn an opening to recite key facts, Diahn was not provided with an understanding of the relevant legal standard, so he could not adequately focus his testimony. The IJ merely asked Diahn if there was "anything else that [Diahn] would like to add to tell [the IJ] about the hardship [Diahn] would suffer?" J.A. 545. Diahn

22

responded in the negative. IJ McDermott's failure, combined with the missing letters corroborating the hardship imposed by Diahn's departure, prevented Diahn from meeting the requisite standard.

The IJ likewise failed to elicit facts as to Diahn's asylum claim.[6] The IJ's duty to develop the record—already weighty in pro se cases—applies with "even greater force" in asylum cases because "the law of asylum is one of the most complex areas thereof." *Quintero*, 998 F.3d at 632. IJ McDermott began by discussing the exceptions to the one-year filing bar at issue in 8 U.S.C. § 1158(a)(2)(B). IJ McDermott also briefly asked Diahn about his criminal history. But IJ McDermott did not mention that "membership in a particular social group" is a cognizable category for those seeking asylum under 8 U.S.C. § 1158(b)(1)(B). The IJ did not even use the term "particular social group," let alone ensure Diahn established the facts necessary to demonstrate he was eligible for relief based on his membership in that group. In *Quintero*, we recognized that immigration judges "*must*, at a minimum, adequately explain in plain language: what a particular social group is; the three elements of cognizability; what types of evidence may be potentially relevant to the applicant's claim; and how the applicant may prove his or her eligibility for relief." 998 F.3d at 633 (emphasis added).[7] Such a duty stems from the "decades-long common practice

---

[6] As is clear from the IJ's opinion, its asylum determination was dispositive to its statutory withholding of removal determination. J.A. 12.

[7] We also noted that "[i]mmigration judges must also seek clarification as needed; help the applicant identify and delineate any potentially cognizable particular social group(s) supported by his or her factual circumstances; and ultimately consider those groups as well as any groups proposed by the applicant in determining eligibility for asylum or withholding of removal." *Quintero*, 998 F.3d at 634.

23

among Immigration Judges [to] enter[ ] into a dialogue with respondents to identify claims for relief, including defining a legally sufficient particular social group." *Id.* (internal citations omitted). The IJ's failure to do so in Diahn's case requires vacatur under our precedent.

What's more, IJ McDermott never discussed the fact that noncitizens must establish both a subjective and objective fear of persecution. *Marynenka*, 592 F.3d at 600. So, though IJ McDermott recognized that Diahn contributed credible subjective testimony, he determined that Diahn did not adequately meet the objective prong, which was ultimately fatal to the merits of Diahn's asylum claim. And IJ McDermott's failure to elicit facts to substantiate the objective prong exacerbated IJ Golparvar's failure to help Diahn "identify[] appropriate sources of evidence to support [his] claim." *Quintero*, 998 F.3d at 629 (citing *Agyeman*, 296 F.3d at 884).

Finally, addressing Diahn's CAT claims, IJ McDermott asked Diahn to express how he met the requirements for relief under CAT in "as much detail as possible." J.A. 553. Diahn described the manner in which members of the LGBTQ community in Liberia are harmed, and even killed, because of their sexual orientation. Diahn then described the evidence he sent to the Baltimore Immigration Court, including three letters from family members, as well as country conditions research. He stated that he was unaware of his ability to bring witnesses to the hearing. Diahn noted that he is "not like legally savvy to know like the ins or out of immigration courts." *Id.*

Yet IJ McDermott did not sua sponte offer a continuance or explain the process to ensure Diahn could secure witnesses, as the regulations permit. 8 C.F.R. § 1240.6. He did not ask follow-up questions to Diahn regarding what the letters from his mother, cousin,

24

and brother said to provide Diahn with an opportunity to establish an over-fifty-percent likelihood of persecution if he returned to Liberia. Nor did he ask Diahn to elaborate on the information contained in the country conditions research he submitted to the Baltimore Immigration Court. This was error.

The Government's reliance on *Tepas v. Garland*, 73 F.4th 208, 216 (4th Cir. 2023) is misplaced. When Tepas, a pro se asylum applicant, expressed that he feared gang violence, the IJ "probed further" to understand Tepas's interactions with gangs. *Id.* at 212. But because Tepas simply exhibited a generalized fear of violence from gangs, the IJ determined that Tepas had not raised a cognizable asylum claim. *Id.* at 216–17. On appeal, we held that the IJ satisfied its duty. *Id.* at 217. In contrast, Diahn shared multiple facts that could support relief, including his LGBTQ identity, a history of family persecution during a civil war, and a lack of connection to Liberia. Unlike the generalized fear presented in *Tepas*, the facts Diahn shared triggered a duty on the IJ's part to sufficiently develop the record. Moreover, the IJ in Diahn's case failed to explain legal standards for multiple forms of relief; did not clarify procedural requirements, such as witness and evidence submission; and failed to consider the documentary evidence that Diahn tried to submit. So unlike the IJ in *Tepas*, the IJs' failures in Diahn's case pervaded the proceedings.

In sum, the IJ failed to fulfill its affirmative duty. Like the petitioner in *Quintero*, Diahn is a "detained, pro se application with only a high school education" and "no legal training." 998 F.3d at 640. But the IJ did not "adequately explain[]" the "relevant legal requirements in plain language" or apprise Diahn of the "appropriate sources of evidence

25

to support [his] claim[s]." *Id.* at 629 (citing *Agyeman*, 296 F.3d at 884). The IJ's overlapping failures encumbered Diahn's ability to make his case and prejudiced Diahn in his pursuit for relief.

We therefore grant Diahn's petition and vacate the Board's determination.

D.

We independently recognize that the IJ's actions, which contravened the statutory duty to develop the record, likely rendered Diahn's removal proceedings constitutionally inadequate. The Government concedes that Diahn never received written notice of the date of his merits hearing or where the hearing would occur. Resp. Br. 29–37. The only written notice Diahn received stated that his hearing would occur on October 6, 2023, before the Baltimore Immigration Court. In actuality, the hearing occurred on October 12, before the Philadelphia Immigration Court, and Diahn was only informed of this change orally, at a hearing. This suffices to demonstrate Diahn did not receive the "opportunity to be heard at a meaningful time and in a meaningful manner." *Rusu*, 296 F.3d at 321–22 (4th Cir. 2002) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *see United States v. El Shami*, 434 F.3d 659, 665 (4th Cir. 2005) (recognizing fundamental unfairness where government failed to provide written notice of hearing).

Diahn also received no written notice of where to send his documentary evidence. IJ Golparvar's instruction that Diahn should submit his evidence to the Philadelphia Immigration Court created confusion that bears out in the record. That instruction hardly made clear that IJ Golparvar was no longer the proper recipient for Diahn's evidence. As a

26

result, IJ McDermott did not receive Diahn's documentary evidence in time for the merits hearing, creating gaps in the record that impacted Diahn's ability to present his case to the IJ.

Additionally, IJ Golparvar did not adequately apprise Diahn that he could present witness testimony at his hearing to corroborate his claims. *See* J.A. 561 ("[O]nly think [sic] I know about the hearings is that it's through video.  I didn't know nobody could join.").  Nor did IJ McDermott offer Diahn a continuance, as permitted by 8 C.F.R. § 1240.6, when Diahn expressed that he had not brought witnesses because he was unaware that he could do so.  *Cf. Huang v. Gonzales*, 157 F. App'x 608, 609 (4th Cir. 2005) (recognizing that there was no due process violation where respondent declined IJ's offer for continuance to permit witness testimony).  This, too, impacted Diahn's ability to fully argue his case  before the IJ.

These violations, taken together, likely prejudiced Diahn.  The link "need not be ironclad . . . . So long as the defendant shows that but for the [due process] errors complained of, there was a reasonable probability that he would not have been deported, the prejudice prong is satisfied." *United States v. Fernandez Sanchez*, 46 F.4th 211, 220 (4th Cir. 2022).  Diahn satisfied this standard.  The record is clear that IJ Golparvar's failure to explain where and when Diahn should submit evidence, *see supra* p. 6, combined with his failure to adequately notify Diahn that he could provide witness testimony, impacted Diahn's ability to make his case before IJ McDermott.  *See* J.A. 418–19 (discussing Diahn's failure to corroborate his claim of LGBTQ membership).  And those gaps in the record are a result of the IJ's miscommunications:  Diahn stated that the excluded documentary evidence sent to the Baltimore Immigration Court corroborated his claims of

27

LGBTQ membership, the persecution he would experience in Liberia, and the hardship his deportation would impose on him and his family. Oral Arg. 6:50-6:57. Declining Diahn relief without considering the confluence of procedural errors that prejudiced his presentation of his case was in error, too.

IV.

Immigration judges have a statutory duty to develop the record, particularly in cases involving pro se, detained noncitizens. The immigration judges' failure to abide by that duty encumbered Diahn's ability to make his case. Compounding the IJs' failures, the Government neglected to ensure Diahn received proper notice and an adequate opportunity to present his case, in contravention of long-established due process protections. Accordingly, we grant Diahn's petition, vacate Diahn's final order of removal, and remand to the Board with instructions to remand to the IJ for further fact-finding regarding Diahn's claims.

*PETITION GRANTED, ORDER VACATED*
*AND REMANDED WITH INSTRUCTIONS*

TOBY HEYTENS, Circuit Judge, concurring in the judgment in part and dissenting in part:

I too would grant Diahn's lead petition for review (No. 24-2066) but not based on either his statutory failure-to-develop-the-record argument or his constitutional due process argument. In my view, the former is unexhausted and Diahn cannot establish prejudice for any due process violation that occurred. That said, I would grant the petition and vacate the underlying order because the agency erred in concluding that his bank fraud conviction *automatically* qualifies as a particularly serious crime and thus bars his application for withholding of removal under the Convention Against Torture. And having vacated the final order of removal, I would dismiss Diahn's other two petitions for review (No. 24-2154 and No. 25-1692) as moot because they seek review of the Board of Immigration Appeals' denial of his motions to reopen or reconsider that now-vacated order.

\*   \*   \*

I would not reach the merits of Diahn's argument that the immigration court neglected its "affirmative duty . . . to develop the record in removal proceedings," Diahn Br. 39, because Diahn failed to exhaust that issue before the Board. See 8 U.S.C. § 1252(d)(1). To be sure, "an applicant doesn't need to conjure any magic words to adequately raise an issue to the Board." *Lopez-Benitez v. Garland*, 91 F.4th 763, 771 (4th Cir. 2024) (quotation marks removed). But for an argument to be deemed exhausted, a noncitizen's filings with the Board "must at least launch the appropriate argument." *Id.* (alterations and quotation marks removed).

Diahn's Board brief did not even "launch" an argument that the immigration court failed to perform its statutory duty to fully develop the record. See, *e.g.*, JA 329–30

29

(challenging only the immigration judge's failure to consider certain evidence). That brief never cited the statute from which the duty is derived. See 8 U.S.C. § 1229a(b)(1). It did not reference any of this Court's leading cases describing the duty. See, *e.g.*, *Quintero v. Garland*, 998 F.3d 612, 622–40 (4th Cir. 2021); *Tepas v. Garland*, 73 F.4th 208, 214–17 (4th Cir. 2023). Nor did the brief say anything else that plausibly put the Board on "notice of Mr. Diahn's objections to the [immigration judge]'s failure to comply with" its duty to develop the record. Diahn Reply Br. 16. Thus, because the government has timely raised the "mandatory" exhaustion requirement, *Tepas*, 73 F.4th at 213, I would not reach the merits of Diahn's failure-to-develop-the-record claim—much less grant his petition for review on that basis.[1]

I also would not grant Diahn's petition based on his constitutional due process claim. To be sure, the record reveals a tangled procedural history and a persistent lack of notice about key information—which is particularly troubling because Diahn was proceeding pro se. But even assuming that what happened here amounted to a due process *violation*, I do not believe Diahn has established he was prejudiced by any such violation.

The evidentiary record before the immigration court included Diahn's "credible" testimony about his fears of persecution and the government's "own evidence" about the risks LGBTQ individuals face in Liberia. Diahn Br. 38; see also *id.* (noting the immigration

---

[1] Perhaps recognizing this exhaustion problem, Diahn's reply brief argues that "the [immigration judge]'s failure to develop the record . . . would further support [his] due process claim, which he indisputably preserved by raising it below." Diahn Reply Br. 17 n.2. Even accepting that reframing, I would still conclude that Diahn's due process claim fails because he has not demonstrated prejudice.

judge "acknowledged the violence against LGBTQ persons in Liberia"). And although the documentary evidence that underlies Diahn's due process claim was not part of that record, the immigration judge gave Diahn an opportunity to testify about its contents. Even before this Court, Diahn fails to explain how adding the actual, physical copies of the underlying evidence to the record already in front of the immigration judge would have changed the decision to deny relief. I thus would conclude Diahn failed to carry his burden of establishing prejudice, see *Atemnkeng v. Barr*, 948 F.3d 231, 241 (4th Cir. 2020), and reject his due process claim on that basis.

*    *    *

That said, I still would grant Diahn's lead petition for review because the Board gave a legally unjustifiable explanation for denying his application for withholding of removal under the Convention Against Torture (CAT).

The Board concluded Diahn "waived" any claim about CAT-withholding because his brief did "not allege error [in] the Immigration Judge's finding that he failed to meet his burden of establishing eligibility for protection under the CAT." JA 309. That was wrong. Diahn's Board brief *did* raise an argument about CAT protection—namely, that the immigration court erred in denying his CAT-withholding claim based on the erroneous determination that his bank fraud conviction automatically barred that claim.

The Board's error in concluding Diahn waived any argument is compounded by the fact that Diahn's argument was right: His bank fraud conviction does not *necessarily* bar his CAT-withholding application because that conviction only carried a sentence of "33 months and 25 days"—that is, a little less than three years. JA 409. But as this Court has

31

explained, the applicable per se bar applies *only* to "aggravated felon[ies] for which the noncitizen has been sentenced to an aggregate term . . . of at least five years." *Annor v. Garland*, 95 F.4th 820, 826 (4th Cir. 2024) (alterations and quotation marks removed); accord 8 C.F.R. § 1208.16(d)(2)(i). For that reason, the agency was required to perform a two-step analysis to determine whether Diahn's bank fraud conviction counts as a particularly serious crime. See *Annor*, 95 F.4th at 827 (describing the relevant Board precedent). Neither the immigration judge nor the Board did so. That was legal error. See, *e.g.*, *Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025) (explaining that, "when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid" (quotation marks removed)).[2]

Finally, I disagree with the government's assertion that this error was harmless. The government correctly points out that Diahn "did not challenge" before the Board the immigration judge's "merits-based denial of" his application for *deferral* of removal—a type of relief whose eligibility requirements are similar to those for the CAT-based *withholding* of removal claim we are concerned with here. Gov't Br. 47; compare 8 C.F.R. § 1208.16 (withholding), with § 1208.17 (deferral). And if the Board had affirmed the immigration judge's denial of Diahn's CAT-deferral claim on the merits—for example, by

---

[2] Although this error also applies to Diahn's statutory withholding claim, I would not grant Diahn's petition based on that claim because the Board affirmed the denial of that form of relief on alternative grounds. See *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015) (noting that when the Board "issues its own opinion without adopting the [immigration judge]'s reasoning, we review only the [Board]'s final order").

32

concluding he did not meet one of the eligibility requirements—I agree a CAT-withholding claim would fail for the same reasons and a remand would thus be futile.

That is not what happened here, however. Instead, the Board said nothing about the merits of *either* CAT claim because it wrongly concluded Diahn waived any objections to the immigration judge's denial of *both* forms of relief. True, Diahn did not challenge the immigration judge's denial of CAT-deferral before the Board. But Diahn's choice not to raise any merits arguments about that ruling does not mean he has conceded—much less in a binding way—that all subsidiary conclusions that formed the basis for that ruling were correct. Thus, it would be entirely coherent for the Board to hear, consider, and even agree with Diahn's arguments about CAT-*withholding* despite his failure to challenge the immigration judge's ruling about CAT-deferral. See Gov't Br. 48 (acknowledging that CAT-deferral and CAT-withholding "are separate forms of protection").

\* \* \*

For the reasons stated above, I would grant Diahn's lead petition for review, vacate the final order of removal, and remand to the Board for further proceedings. I would not, however, specifically instruct the Board to return the matter to the immigration judge for a new hearing. I thus concur in the judgment in part and dissent in part.

33